ESCHBACH, Circuit Judge.
 

 Image Worldwide, Ltd. guaranteed loans paid to an affiliate corporation, Image Marketing, Ltd. Both corporations were owned by the same person, but only Image Marketing received funds from the loan. The Image Worldwide’s bankruptcy trustee filed suit to avoid the guarantees as a fraudulent transfer, alleging that the guarantees made Image Worldwide insolvent, and that Image Worldwide did not receive reasonably equivalent value in exchange for its guarantees. The bankruptcy and district courts found in favor of the trustee. This bankruptcy appeal presents the issue of when a corporation receives reasonably equivalent value for its guarantee of an affiliates’ debts. The bankruptcy court held that a guarantor must receive direct economic benefits in exchange for its guarantee in order to have received reasonably equivalent value for its guarantee. While the bankruptcy court applied an overly narrow interpretation of what may constitute reasonably equivalent value for a guarantee, the bankruptcy court did not clearly err in finding that Image Worldwide did not receive reasonably equivalent value for its guarantees. We affirm.
 

 I. Facts
 

 Richard Steinberg was the sole shareholder, sole officer, and sole director of Image Marketing, Ltd. (IM), an Illinois corporation incorporated in June 1991. IM was in the commercial printing business, primarily dealing in wholesale sales of music and sports merchandise. IM leased space from FCL Graphics, a printing company that did all of the printing for IM.
 

 In 1992, IM obtained a line of credit from Parkway Bank secured by a first lien against substantially all of IM’s assets (IM loan). The line of credit allowed IM to borrow against up to 70% of its eligible accounts receivable, and required IM to reduce its indebtedness to 70% of its accounts receivable in the event that its eligible accounts receivable declined. By June 1993, IM had borrowed $300,000 on its line of credit.
 

 At the end of 1993, IM was several hundred thousand dollars in debt to trade creditors. So in December 1993, Steinberg incorporated a new Illinois corporation; Image Worldwide, Ltd. (IW). Steinberg was the sole shareholder, officer, and director of IW as well. IW leased the same space from
 
 *576
 
 FCL as IM, used the same suppliers, and had many of the same customers. In early 1994, Steinberg liquidated IM. Parkway knew of and cooperated in the liquidation of IM. Instead of demanding that IM pay off its loan under the terms of the agreement, however, Parkway allowed Steinberg to use the money obtained from the liquidation of IM to pay down IM’s trade debts. Parkway never required IM to pay off its loan, even when its accounts receivable declined to zero in 1994.
 

 Instead, Parkway demanded that IW guarantee IM’s $300,000 debt. IW executed the guarantee on May 27, 1994. The guarantee was secured by a first lien on substantially all of IWs assets. IW never borrowed any money from Parkway on its own. Parkway’s consideration for the guarantee was its allowing IW to stay in business. Between May 27,1994 and when IW was forced into bankruptcy, IW paid principal and interest on the loan as it became due.
 

 Even after IM was wound down, IM still owed $200,000 to FCL Graphics. Parkway lent $200,000 to Steinberg to pay this debt (Steinberg loan). The bank paid the proceeds from this loan directly to FCL.
 
 [1]
 
 The loan was secured by all of IW’s accounts receivable. As of the date of its bankruptcy, IW had paid down $72,076.49 in principal and $26,863.45 in interest on the loan.
 

 IW was no more successful than IM. At trial, Parkway stipulated that the guarantees made IW insolvent. In August 1995, FCL stopped doing work for IW, and filed an involuntary chapter 7 petition for bankruptcy against IW. David Leibowitz was appointed as the trustee of IWs bankruptcy estate. Over the trustee’s objection, Parkway obtained relief from the automatic stay, and collected IWs accounts receivable to pay down the debts guaranteed by IW. All told, Parkway collected $444,507.55 from IW, including the amounts paid prior to the bankruptcy.
 

 The trustee instituted this adversarial proceeding in July 1996 to recover the amounts transferred to Parkway. Pursuant to 11 U.S.C. § 544(b), the trustee charged that the transfers to Parkway were fraudulent transfers in violation of the Uniform Fraudulent Transfer Act (UFTA), 740 ILCS 160/5, because IW never received reasonably equivalent value for its guarantees to Parkway. The bankruptcy court found in favor of the trustee, and ordered Parkway to disgorge the amounts it received from IW. The district court affirmed.
 
 See Leibowitz v. Parkway Bank & Trust Co.,
 
 210 B.R. 298 (N.D.Ill.1997). Parkway now appeals to this court, arguing that IW did receive reasonably equivalent value, and that the trustee did not meet all of the requirements of 740 ILCS 160/5.
 

 II. Standard of Review
 

 A bankruptcy court’s findings of fact are reviewed for clear error. Fed. R. Bankr.P. 8013. Both the district court’s and the bankruptcy court’s legal interpretations are reviewed de novo.
 
 In re Birkenstock,
 
 87 F.3d 947, 951 (7th Cir.1996). Whether “reasonably equivalent value” was received in a transaction is a question of fact.
 
 [2]
 

 Heritage Bank Tinley Park v. Steinberg (In re Grabill),
 
 121 B.R. 983, 994 (Bankr.N.D.Ill.1990);
 
 cf. In re Xonics Photochem., Inc.,
 
 841 F.2d 198, 202 (7th Cir.1988) (whether or not a corporation received a benefit from a guarantee is a question of fact).
 

 III. Analysis
 

 The federal fraudulent transfer statute, 11 U.S.C. § 548, contains a one year statute of limitations that barred the trustee from using that section to avoid the transfer. However, under the strong-arm provision of the Bankruptcy Code, 11 U.S.C. § 544(b), the trustee can avoid any transaction of the debt-
 
 *577
 
 or that would be voidable by any actual unsecured creditor under state law.
 
 See In re Leonard,
 
 125 F.3d 543, 544 (7th Cir.1997). The trustee need not identify the creditor, so long as the unsecured creditor exists.
 
 Id.
 
 Thus, the trustee proceeded against Parkway under the constructive fraud provision of the UFTA, which states:
 

 (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor’s claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
 

 (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
 

 (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
 

 (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they become due.
 

 740 ILCS 160/5(a). Because Parkway has stipulated that the transaction rendered IW insolvent, the key issue in this case is whether IW, as guarantor, received reasonably equivalent value for its guarantee when the direct benefits of the transaction were received by a third party, IM. Parkway argues that its allowing IW to stay in business constituted reasonably equivalent value for IW’s guarantee of IM’s debt. Parkway also attempts to argue that IM and IW were the same entity.
 

 A.
 

 Because the UFTA is a state law, we must predict how the Illinois courts would handle Parkway’s claims. The Illinois courts have not yet elaborated on what “reasonably equivalent value” is for purposes of § 160/5. One Illinois Appellate Court has stated that this is no reasonably equivalent value when there is “no or inadequate consideration,”
 
 Regan v. Ivanelli,
 
 246 Ill.App.3d 798, 187 Ill.Dec. 351, 617 N.E.2d 808, 814 (1993), but no Illinois court has defined the phrase in the context of a guarantee where the principal benefits are received by a third party. However, as its title indicates, the UFTA is a uniform act, and it derived the phrase “reasonably equivalent value” from 11 U.S.C. § 548(a)(2).
 
 See Bowers-Siemon Chems. Co. v. H.L. Blackford, Ltd. (In re Bowers-Siemon Chems. Co.),
 
 139 B.R. 436, 445 (Bankr.N.D.Ill.1992) (UFTA parallels § 548);
 
 see also
 
 Phillip I. Blumberg,
 
 Intragroup (Upstream, Cross-Stream, and Downstream) Guarantees Under the Uniform Fraudulent Transfer Act,
 
 9 Cardozo L.Rev. 685, 695-696 (1987) (UFTA was an effort to harmonize state law with the Bankruptcy Code). Thus, we can look to interpretations of “reasonably equivalent value” from § 548 cases, as well as cases from courts interpreting other states’ versions of the UFTA for assistance in predicting what an Illinois court would do.
 

 B.
 

 The bankruptcy court determined as a matter of law that “a conveyance by a corporation for the benefit of an affiliate is not regarded as given [sic] fair consideration to the creditors of the conveying corpprations,” citing
 
 Rubin v. Manufacturers Hanover Trust Co.,
 
 661 F.2d 979 (2d Cir.1981). This determination is an overly narrow statement of law, and misreads the holding of
 
 Rubin.
 
 Nevertheless, under the appropriate law, the bankruptcy court did not clearly err in ruling that the guarantees were fraudulent transfers.
 

 1.
 

 The transactions in question are known in corporate law lingo as an “intercorporate guarantee.” These fall into three types: “upstream,” “downstream,” and “cross-stream.” An upstream guarantee is when a subsidiary guarantees the debt of its parent; a downstream guarantee is when a parent corporation guarantees a debt of its subsidiary; a cross-stream guarantee is when a corporation guarantees the debt of an affiliate.
 
 See
 
 Jack F. Williams,
 
 The Fallacies of Contemporary Fraudulent Transfer Models as Applied to Intercorporate Guaranties:
 
 
 *578
 

 Fraudulent Transfer Law as a Fuzzy System,
 
 15 Cardozo L.Rev. 1403, 1419-20 (1994) [hereinafter Williams, Fallacies]. IWs guarantees in this ease were cross-stream guarantees.
 

 Intercorporate guarantees are a routine business practice, and their potential voida-bility creates a risk for unwary lenders.
 
 See generally
 
 Blumberg,
 
 Intragroup
 
 Guarantees; Williams,
 
 Fallacies,
 
 15 Cardozo L.Rev. at 1418-20; Barry L. Zaretsky,
 
 Fraudulent Transfer Law as the Arbiter of Unreasonable Risk,
 
 46 S.C. L.Rev. 1165 (1995); Scott F. Norberg, Comment,
 
 Avoidability of Intercorporate Guarantees Under Sections 548(b) and 544(b) of the Bankruptcy Code,
 
 64 N.C. L.Rev. 1099 (1986). Intercorporate guarantees are common because they benefit both the creditor and debtor in a loan transaction.
 
 See
 
 Williams,
 
 Fallacies,
 
 15 Cardozo L.Rev. at 1418—20; Norberg, 64 N.C. L.Rev. at 1099. Within a corporate group, some units will often have better credit ratings than others. The units which are perceived as credit risks by lenders will be either unable to obtain loans, or able to obtain a loan only at a higher interest rate. However, when the corporate group exploits the units with good credit ratings by having them guarantee the debt of the weaker unit, the weaker unit will1 benefit from either obtaining the loan, or getting the loan at a better rate. The creditor benefits from greater security in repayment. So between creditor and debtor, the guarantee is a win-win situation.
 

 However, the creditors of the guarantor making a cross-stream guarantee can sometimes lose out in the transaction, because the guaranteeing corporation may not receive a direct economic benefit from the guarantee.
 
 See Rubin,
 
 661 F.2d at 991. Should the guarantee push the guarantor into insolvency, these transactions will be scrutinized under a fraudulent transfer analysis. Fraudulent transfer law seeks to preserve assets of the estate for creditors.
 
 In re Bundles,
 
 856 F.2d 815, 824 (7th Cir.1988). Some courts applying traditional fraudulent transfer rules to intercorporate guarantees therefore found that the guarantor had not received reasonably equivalent value for the guarantee, because from the standpoint of the unsecured creditor, the guarantor had received no consideration for the guarantee.
 
 See
 
 Williams,
 
 Fallacies,
 
 15 Cardozo L.Rev. at 1431-32.
 

 However, requiring a direct flow of capital to a cross-guarantor to avoid a finding of a fraudulent transfer “is inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans.”
 
 Telefest, Inc. v. VU-TV Inc.,
 
 591 F.Supp. 1368, 1379 (D.N.J.1984). Often, these guarantees are legitimate business transactions, and not made to frustrate creditors. In recognition of this economic reality, courts have loosened the old rule that transfers primarily for the benefit of a third party invariably give no consideration to the transferor. Thus, even when there has been no direct economic benefit to a guarantor, courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor received indirect benefits from the guarantee if there has been an indirect benefit.
 
 See, e.g., Xonics,
 
 841 F.2d at 201;
 
 Rubin,
 
 661 F.2d at 991-92;
 
 Telefest,
 
 591 F.Supp. at 1377-81. “[0]ne theme permeates the authorities upholding guaranty obligations: that the guaranty at issue was the result of arm’s length negotiations at a time when the common enterprise was commercially viable.” Williams,
 
 Fallacies,
 
 15 Cardozo L.Rev. at 1438.
 

 Generally, a court will not recognize an indirect benefit unless it is “fairly concrete.”
 
 See Heritage Bank Tinley Park v. Steinberg (In re Grabill Corp.),
 
 121 B.R. 983, 995 (Bankr.N.D.Ill.1990). The most straightforward indirect benefit is when the guarantor receives from the debtor some of the consideration paid to it.
 
 See Rubin,
 
 661 F.2d at 991;
 
 Grabill,
 
 121 B.R. at 995-96. But courts have found other economic benefits to qualify as indirect benefits. For example, in
 
 Mellon Bank, N.A. v. Metro Communications, Inc.,
 
 945 F.2d 635, 646-48 (3d Cir.1991), the court found reasonably equivalent value for a debt- or corporation’s guarantee of an affiliate’s debt when the loan strengthened the corporate group as a whole, so that the guarantor corporation would benefit from “synergy”
 
 *579
 
 within the corporate group. The
 
 Mellon
 
 court stated that indirect benefits included intangibles such as goodwill,
 
 id.
 
 at 647, and an increased ability to borrow working capital.
 
 Id.
 
 at 648.
 
 Telefest
 
 indicated that indirect benefits to a guarantor exist when “the transaction of which the guaranty is a part may safeguard an important source of supply, or an important customer for the guarantor. Or substantial indirect benefits may result from the general relationship” between affiliates. 591 F.Supp. at 1380-81 (quoting Normandin, “Intercorporate Guarantees and Fraudulent Conveyances,”
 
 in
 
 Personal Property Security Interests Under the Revised UCC 361, 37071 (1977)). In
 
 Xonics,
 
 we recognized the ability of a smaller company to use the distribution system of a larger affiliate as an indirect benefit as well.
 
 See Xonics,
 
 841 F.2d at 202.
 

 2.
 

 The trustee argues that “transfers made or obligations incurred for the benefit of third parties do not furnish reasonably equivalent value to the debtor, unless the debtor’s net worth is unaffected by the transfer because it received a direct economic benefit from the transfers.” However, the cases cited by the trustee do not support this argument! Two of the three cases explicitly acknowledge that indirect benefits can constitute reasonably equivalent value. The quoted language itself is a paraphrase of
 
 Coan v. Stone Oil Co. (In re Globe Tanker Services, Inc.),
 
 151 B.R. 23, 24-25 (Bankr.D.Conn.1993) that conveniently omits the court’s reference to indirect benefits. The actual quote says “unless the debt- or’s net worth is unaffected because it received a direct or
 
 indirect
 
 economic benefit from the transfer.”
 
 Id.
 
 at 25 (emphasis added).
 
 See also In re Augie/Restivo Baking Co., Ltd.,
 
 87 B.R. 242, 247 (Bankr.E.D.N.Y.1988) (quoting
 
 Rubin
 
 indirect benefit language). The third case, while not explicitly referring to the indirect benefit rule, does indicate that when consideration indirectly flows to the transferor, a transfer for the benefit of a third party may not be a fraudulent transfer.
 
 See Murray v. Prescott, Ball & Turben, Inc. (In re Chicago, Mo. & Western Ry. Co.),
 
 124 B.R. 769, 773 (Bankr.N.D.Ill.1991).
 

 The case which the trustee most relies upon to support his argument that a guarantee of a third party’s debt is not reasonably equivalent value is
 
 Osage Crude Oil Purchasing, Inc. v. Osage Oil & Transp., Inc. (In re Osage Crude Oil Purchasing, Inc.),
 
 103 B.R. 256 (Bankr.N.D.Okla.1989). However, the reasoning of
 
 Osage Crude
 
 is unpersuasive. In
 
 Osage,
 
 Osage Oil and Transportation (Transportation) set up a subsidiary, Osage Crude (Crude), to handle part of Transportation’s business. Crude was a separate corporation, although the directors and officers of the two companies were the same people. When Transportation subsequently refinanced some of its loans, Crude, guaranteed the refinanced loans with substantially all of its assets. The payment of obligations under the loan drove Crude to file for bankruptcy, and the court found that the guarantee was a fraudulent conveyance under the Uniform Fraudulent Conveyances Act. In determining whether or not the guarantee was fraudulent, the
 
 Osage
 
 court looked only at the direct benefits accruing to Crude under the guarantee.
 
 Osage
 
 relies heavily on
 
 Rubin
 
 as support for its view, but the.
 
 Osage
 
 court ignored
 
 Rubin’s
 
 discussion of indirect benefits. This complete disregard of indirect benefits places
 
 Osage
 
 outside the mainstream of recent authority.
 
 See
 
 Williams,
 
 Fallacies,
 
 15 Cardozo L.Rev. at 1432 (“The weight of recent authority acknowledges that indirect benefits received by a debtor for guaranteeing the payment of a third party’s debt may constitute a reasonably equivalent value.”). While the indirect benefits received by Crude may not have been reasonably .equivalent to the value it gave up pursuant to the guarantee, the absence of any discussion of the subject in the opinion limits
 
 Osage’s
 
 persuasiveness. We believe that indirect benefits may be considered as part of the inquiry into reasonably equivalent value in a transaction.
 

 3.
 

 However, in order to prevail, Parkway must show that the bankruptcy court clearly erred in finding that no consideration or reasonably equivalent value were given in
 
 *580
 
 exchange for the guarantee. Parkway argues that its allowing IW to stay in business constituted reasonably equivalent value for the guarantee. The trustee, relying on
 
 Leonard v. Norman Vinitsky Residuary Trust (In re Jolly’s Inc.),
 
 188 B.R. 832 (Bankr.D.Minn.1995), counters that allowing the guarantor to stay in business can never be reasonably equivalent value for the guarantee of a third party’s debt.
 
 Jolly’s
 
 does not support this broad proposition.
 

 Jolly’s
 
 involved the guarantee by a wholly owned subsidiary of its parent company’s debt. The parent company (SEI) acquired Jolly’s in a leveraged buyout (LBO). The debt SEI incurred in the acquisition of Jolly’s was secured by the stock of Jolly’s, as well as substantially all the assets of Jolly’s. When Jolly’s was involuntarily forced into bankruptcy, the defendants argued that the reasonably equivalent value for this guarantee was “the opportunity to continue to carry on business, relieved of the immediate threat of foreclosure by [the secured creditor].”
 
 Id.
 
 at 843. While the
 
 Jolly’s
 
 court did find that this was inadequate value in that case, its analysis does not extend beyond the LBO context. Indeed, other courts have noted the uniqueness of the LBO:
 

 The effect of an LBO is that a corporation’s shareholders are replaced by secured creditors. Put simply, stockholders’ equity is supplanted by corporate debt. The level of risk facing the newly structured corporation rises significantly due to the increased debt to equity ratio. This added risk is borne primarily by the unsecured creditors, those who will most likely not be paid in the event of bankruptcy.
 

 See Mellon,
 
 945 F.2d at 645-46.
 

 The
 
 Jolly’s
 
 court reasoned that the interests of the acquirer and the target company diverge markedly after an LBO because of the unusually low shareholder equity. See
 
 Jolly’s,
 
 188 B.R. at 843-45. The court explicitly noted that its reasoning was not generally applicable:
 

 For the particularized fraudulent transfer analysis required here,
 
 the benefit, if any, derived by the Debtor has to be determined with reference to its effect on the Debtor’s own creditors. In a very real way, the law made the Debtor’s interests in connection with the LBO coincident with the interests of its creditors. When the pledge was made, those creditors had a higher claim to the Debtor’s resources under law than did SEI, its shareholder.
 
 Far the purposes of this proceeding,
 
 the Debtor must be deemed to have had an overriding interest in seeing that its own creditors were paid.
 

 Id.
 
 at 844 (emphasis added). Thus, while a subsidiary may have a greater interest in paying its creditors than in surviving as a going concern after an LBO, the
 
 Jolly’s
 
 analysis does not apply outside of the LBO context.
 

 Even so, Parkway fails to show that IW received reasonably equivalent value for the IM loan. We agree with the bankruptcy court that there was no consideration for the guarantee of the IM loan. In this ease, prior to IWs signing the guarantee to repay IM loan, Parkway had no claim against IW because IW had never dealt with Parkway. Parkway might have had a claim against IM or Steinberg (though this is questionable, given that uncontroverted testimony at trial showed that Parkway was aware of and cooperated in the liquidation of IM), but Parkway could not have attacked IW for the winding down of IM. While Parkway might have decided not to exercise its rights against IM under the IM loan, under Illinois law, forbearance is sufficient consideration for a guarantee only when it is pursuant to an agreement to forbear.
 
 City Nat. Bank of Hoopeston v. Russell,
 
 246 Ill.App.3d 302, 186 Ill.Dec. 251, 615 N.E.2d 1308, 1312 (1993). While an agreement to forbear need not be express, the bank did not allege that such an agreement existed. Even if it had, reasonably equivalent value is something more than consideration to support a contract, see
 
 Xonics,
 
 841 F.2d at 202;
 
 Rubin,
 
 661 F.2d at 991, and in the absence of countervailing factors, such an agreement would not likely meet the higher standard.
 

 Parkway argues in its brief that IW “wrongfully appropriated” IM’s receivables. However, the evidence adduced at trial shows that when IM was wound down, Stein-berg used the proceeds to pay off trade
 
 *581
 
 creditors of IM. Paying off IM’s creditors may have given IW an indirect benefit, since IW generally dealt with the same suppliers as IM, but it does not constitute “appropriation” of IM’s property. The bankruptcy court’s finding that IM’s receivables were used to pay down IM’s trade debts was not clearly erroneous.
 

 4.
 

 The Steinberg loan presents a much closer case, because IW may have received an indirect benefit from this guarantee. FCL Graphics was IWs printer, and thus its most important supplier. FCL also allowed IM and IW to operate their business on FCL’s premises. At trial, Steinberg testified as follows about the benefits to IW from the Steinberg loan:
 

 Q: What, if any, benefit was there to Image Worldwide for you to pay FCL Graphics $200,000?
 

 A: It was allowed to continue doing business remaining on FCL’s premises and having FCL as a supplier.
 

 Q: Is it your testimony that if you hadn’t paid FCL the $200,000, it would have put Image Worldwide out of business? A: Yes.
 

 Q: It would have moved Image Worldwide off the premises?
 

 A: Yes.
 

 Q: It would not have supplied product to Image Worldwide?
 

 A: Yes.
 

 Transcript at 44-45,
 
 Leibowitz v. Parkway Bank & Trust Co.,
 
 210 B.R. 298 (N.D.Ill.1997) (No. 97 C 923). If the Steinberg loan had not been made to pay off IM’s debt to FCL, FCL Graphics clearly posed a substantial threat to IW because of its ability to evict IW and discontinue providing services to IW.
 
 Telefest
 
 states that:
 

 [Some courts have] rationalized upholding various transfers against fraudulent conveyance challenges by finding that sufficient consideration passed to the transfer- or because an opportunity had been given to it to avoid bankruptcy through the strengthening of an affiliated corporation that received the benefit of the transfer. Such an approach seems indisputably proper when a weak but still solvent entity is rendered insolvent only because of the inclusion of the guaranty on the liability side of the balance sheet. This permits the analysis to focus upon economic reality in the appropriate factual context without rewarding legal laxity or inflexibly ignoring real benefits merely because they have no place on the company’s balance sheet.
 

 Telefest,
 
 591 F.Supp. at 1379 (quoting Rosenberg, Intercorporate Guaranties and the Law of Fraudulent Conveyances: Lender Beware, 125 U. Pa. L.Rev. 235, 245-46). Under the broad reading of the indirect benefit doctrine laid down in cases like
 
 Telefest, IW
 
 received an indirect benefit from the payment of the Steinberg loan because the loan kept FCL Graphics from kicking Steinberg and his companies off of FCL’s property, and from refusing to do business with Steinberg. True, the balance sheet showed that IW was insolvent after taking on the IM loan and the Steinberg loan, but IW was not finished as a going concern, as IW was able to remain in business for 17 months after guaranteeing the Steinberg loan.
 

 On the other hand, the circumstances of this case do not fit the circumstances when indirect benefits from a guarantee are found to constitute reasonably equivalent value. As indicated above, courts that uphold cross-stream guarantees generally do so when the transaction strengthens the viability of the corporate group. In this case, though, there were not two functioning corporations that benefitted mutually from the loan. By the time IW guaranteed the Steinberg loan, IM had been wound down. Even though it was not officially dissolved, the company had been liquidated and was inactive. IW became insolvent to pay an inactive affiliate’s debts. Indeed, while IW was able to timely pay the bank pursuant to the loans for a time after guaranteeing the loans, IW eventually fell behind in payments to trade creditors just like IM had. In effect, by paying off IM’s debts, IW kept IM out of bankruptcy by bankrupting itself. This shift of risk from the creditors of the debtor to the creditors of the guarantor is exactly the situation that
 
 *582
 
 fraudulent transfer law seeks to avoid when applied to guarantees.
 
 See Rubin,
 
 661 F.2d at 991. Thus, while IW received an indirect benefit from the transaction, it did not receive reasonably equivalent value.
 

 C.
 

 Parkway makes two further arguments that were rejected by the district court because they were not argued to the bankruptcy court. Arguments not presented to the bankruptcy court are waived on appeal.
 
 See In re Bern,
 
 110 F.3d 462, 466 (7th Cir.1997). First, Parkway argues that Illinois law requires that an unsatisfied pretransfer creditor exist in order to pursue a fraudulent transfer action. Even if this argument had been presented to the bankruptcy court, it would have been frivolous. The Trustee proceeded under 740 ILCS 160/5, and the requirement Parkway cites to is from 740 ILCS 160/6(a), a separate cause of action. Second, pursuant to
 
 Steel Co. v. Morgan Marshall Indus., Inc.,
 
 278 IU.App.3d 241, 214 IU.Dec. 1029, 662 N.E.2d 595 (1996), Parkway argues that there was a de facto merger between IM and IW, so that no independent value to IW need be shown. WhUe Parkway did raise issues related to Steinberg’s ownership of both IM and IW in the bankruptcy court, Parkway never referenced the idea of de facto merger at trial, so the district court’s ruling was correct.
 

 We therefore hold that indirect benefits to a guarantor may be considered when determining whether a corporation receives reasonably equivalent value for a guarantee. However, we do not believe that the bankruptcy court clearly erred when it found that IW did not receive reasonably equivalent value for its guarantees. Thus, the judgment of the district court is
 

 Affirmed.
 

 [1]
 

 . The Bankruptcy Court found that "FCL Graphics was an important customer of Parkway Bank and its sole shareholder, Frank Calabrese, was also a shareholder of Parkway Bank.”
 

 [2]
 

 . The finding that IW did not receive reasonably equivalent value for its guarantee appears in the bankruptcy court’s decision as a "Conclusion of Law."
 
 See Leibowitz v. Parkway Bank & Trust Co.,
 
 No. 95 B 16348, slip op. at 8 (Bankr.N.D.Ill. Jan.21, 1997). However, as correctly noted by the district court, this ruling is indisputably a finding of fact.
 
 See Leibowitz v. Parkway Bank & Trust,
 
 210 B.R. 298, 301 (N.D.Ill.1997); 5 Collier on Bankruptcy ¶ 548.05[l][b], at 548-33 (15th ed. rel. 62, 1997).