### In re JUMER'S CASTLE LODGE, INC., Debtor.

**Creditors' Committee of Jumer's Castle Lodge, Inc., for and on behalf of Jumer's Castle Lodge, Inc., as debtor in possession of the above bankruptcy estate, Plaintiff,**

v.

**D. James Jumer, Defendant.**

**Bankruptcy No. 99–83286.**
**Adversary No. 01–8253.**

United States Bankruptcy Court,
C.D. Illinois.

May 11, 2005.

John S. Elias, Gary T. Rafool, Peoria, IL, for Debtor.

## *OPINION*

WILLIAM V. ALTENBERGER, Bankruptcy Judge.

The parties do not dispute the general facts of the case. However, they do dispute which facts are relevant and should be considered in this Court's determination of the issues and how to interpret the relevant facts of the case.

The Defendant James Jumer ("Defendant") was a principal stock holder in the Debtor, Jumer's Castle Lodge ("JCL"), a motel, located in Peoria, Illinois. The Defendant also had an ownership interest in other motels, Jumers of St. Charles, Illinois (JSC), Jumers of Evansville, Indiana (JE), Jumers of St. Louis, Missouri (JSL), Jumers of Rock Island, Illinois (JRI) and Jumers of Galesburg, Illinois (JG), along with the following assets: Jumers Brewing (JB) and real estate adjacent to JCL (Peoria parcels). JCL carried on its books, the following accounts receivable: JSC$2,767,545, JE-$806,414.12, JSL, JRI and JBA—total of $1,459,110. JCL also carried on its books life insurance on the Defendant with a cash value of $100,504 and three automobiles valued at $64,000.

Because JCL had fallen on hard times, in October of 1997, the Defendant approached Frank Pedulla, who was working for Saranow Gaming Group ("Saranow"), to see if Saranow would be interested in purchasing JCL. Initially, Saranow was interested in purchasing JCL outright. However, due to JCL's poor returns, Saranow proposed an agreement in which it would purchase a 30% interest in JCL, if JCL and the Defendant fulfilled several conditions set by Saranow and its investors. Specifically, Saranow found that there were problems with JCL's asset structure which needed to be cured before Saranow would acquire an interest in JCL. These problems, from Saranow's perspective were: (1) JCL was in default on major loans with Marine Bank and National City Bank (JCL's primary lender), (2) there was too much cross-borrowing on JCL's books (specifically, there were numerous notes and/or recorded accounts receivables due and owing to JCL from other Jumer enterprises and non-hotel assets), and (3) the Defendant owned the property on which JG ("Galesburg property") was being operated, and JCL was paying $14,000

per month to lease this property from the Defendant (causing JCL to spend $168,000 per year to lease this property).

To address these concerns with JCL's asset structure, Saranow insisted on the following conditions as a part of its agreement to purchase JCL stock: (1) the Defendant had to transfer his entire interest in JG to JCL, (2) the Defendant had to transfer the Peoria parcels to JCL, (3) the Defendant had to make a pay-down of at least $1,000,000 to satisfy a portion of the accounts receivable due and owing to JCL from the other Jumer Enterprises, and (4) the Defendant had to accept, in exchange, all of JCL's non-hotel assets consisting primarily of the inter-company accounts receivable, the three automobiles, and the $100,504 of cash value in life insurance.

The Defendant, supported by the affidavit of Frank Pedulla, contends that those conditions were insisted upon by Saranow and JCL's primary lender because (1) they wanted JCL's corporate balance sheet to consist solely of hotel and hotel-related assets, (2) they wanted to get rid of the cross-borrowing and notes/receivables due and owing from the other enterprises owned by the Defendant, (3) they wanted JCL to be more solid and appealing to investors, and (4) they believed that eliminating cross-borrowing with the Defendant's non-hotel enterprises would make it easier for JCL to get financing in the future.

On July 31, 1998, pursuant to the conditions set forth by Saranow, the parties entered into an Agreement for Sale of Real Property (covering the transfers of property and notes between JCL and the Defendant) and a Security Purchase Agreement (covering Saranow's purchase of a 30% interest in JCL for $2,000,000). The above agreements resulted in (1) JCL receiving full ownership interest in JG and

the Peoria parcels, (2) JCL receiving $2,000,000 in capital from Saranow's stock purchase, (3) JCL receiving $1,000,000 from the Defendant, (4) Saranow receiving 30% interest in JCL, (5) the Defendant receiving the $2,767,545 in accounts receivable due and owing to JCL from JSC, (6) the Defendant receiving additional accounts receivables, valued at $1,459,110, due and owing to JCL from the other enterprises owned by the Defendant, (7) the Defendant receiving the three automobiles valued at $64,000, and (8) the Defendant receiving ownership of the life insurance policies owned by JCL with cash value of $100,504.

The Plaintiff, the Creditors Committee, and the Defendant do not dispute any of the above-mentioned facts pertaining to the transactions entered into on July 31, 1998. What they do dispute is the value of JG at the time of the transfer. The Plaintiff argues that JCL did not receive *reasonably equivalent value* because the Defendant's valuation of JG at $4,500,000 was inflated and allowed the Defendant to siphon off $2,400,000 from JCL. Specifically, the Plaintiff contends that JG was only worth $2,100,000 at the time of the transfer (based on an appraisal by Douglas Nelson dated August 11, 2003). According to the Plaintiff, there is further evidence that the Defendant intentionally overvalued JG, in that about the time of these transfers, the Defendant was trying to convince the Knox County Board of Review that the value of the Galesburg hotel property was $2,000,000.

In response, the Defendant contends that JCL did receive *reasonably equivalent value* because his valuation of JG at $4,500,000 was appropriate as it was done by Jay Seaton, a certified appraiser. Further, the Defendant responds that at the time, the Knox County Board of Review's assessed valuation for JG was $1,465,880

and that under Illinois law, "assessed valuation" is established at one-third of the fair market value of real estate.

The Defendant also contends that even under the Plaintiff's appraiser's valuation of JG at $2,100,000, JCL received *reasonably equivalent value* from the transaction. Specifically, the Defendant argues that even though the value on the books of the assets transferred to the Defendant was $4,497,652, the actual value of these assets was only $1,639,614, because the account receivable due and owing to JCL from JSC, which had a face value of $2,767,545, was only worth $16,000—17,000, as the funds transferred from JCL to JSC were intended to be used for a river boat casino. But by July 31, 1998, it became clear that JSC would be unable to secure a gambling license. So the hull for the river boat casino became essentially worthless and was sold as scrap for $10,000.

■■■ The parties start their analysis with Section 544 of the Bankruptcy Code, 11 U.S.C. § 544, which leads them to the Illinois Uniform Fraudulent Transfer Act ("Illinois UFTA"), 740 ILCS § 160/1 *et seq.* As the Plaintiff pointed out, its cause of action arises under Section 544(b), which is centered around state fraudulent conveyance law. Under Illinois law, there are two types of fraudulent conveyances—"fraud in fact" and "fraud in law." *Bowman v. Dixon Theatre Renovation, Inc.,* 221 Ill.App.3d 35, 41, 163 Ill.Dec. 650, 581 N.E.2d 804 (2d Dist.1991). "Fraud in fact" exists where "the debtor has the specific intent to hinder a creditor," and "fraud in law" exists where "the debtor conveys assets for inadequate consideration, rendering himself insolvent, during which he has existing or contemplated indebtedness." *Id.* As discussed above, both parties agree that the issue in this case is "fraud in law." There are two relevant subsections of the Illinois UFTA which addresses "fraud in

law"—Sections 160/5 and 160/6, 740 ILCS §§ 160/5, 160/6.

Section 160/5 pertains to claims arising before or after an allegedly fraudulent transfer or obligation and provides, in relevant part, as follows:

§ 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

\* \* \* \* \* \*

(2) without receiving a *reasonably equivalent value* in exchange for the transfer or obligation, and the debtor (emphasis added):

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Section 160/6 pertains only to claims arising before an allegedly fraudulent transfer or obligation and provides, in relevant part, as follows:

§ 6. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a *reasonably equivalent value* in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation (emphasis added).

The *Bowman* Court compared the relationship between these two subsections and, specifically, it noted that these subsections provide alternate definitions for "fraudulent transfer," with Section 5 defining "a fraudulent transfer as one which the debtor makes without receiving a reasonably equivalent value and while the debtor was engaged in a transaction for which its remaining assets were unreasonably small." *Bowman*, 221 Ill.App.3d at 41, 163 Ill.Dec. 650, 581 N.E.2d 804. Alternatively, Section 6 provides that a fraudulent transfer applies in cases where "the debtor does not receive a reasonably equivalent value for the transferred property and the debtor is insolvent or becomes insolvent as a result of the obligation." *Id.* at 41, 163 Ill.Dec. 650, 581 N.E.2d 804.

The main issue before the Court is whether JCL received *reasonably equivalent value* as a part of the Agreement for the Sale of Property executed between JCL and the Defendant. Both parties in this case have filed cross motions for summary judgment on the issue. Summary judgment in bankruptcy adversary hearings is governed by Bankruptcy Rule 7056. Fed. R. Bankr.P. 7056. Rule 7056, in turn, provides that Rule 56 of the Federal Rules of Civil Procedure applies in adversaries. Rule 56(c), provides in relevant part, that:

The judgment sought shall be rendered forth with if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Supreme Court in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), held that the party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue

of material fact. Furthermore, when the opposing parties both seek summary judgment, a court must rule separately on each motion to determine whether judgment should be entered. *In re Schreiber*, 163 B.R. 327 (Bankr.N.D.Ill.1994). The court may deny both parties' motions for summary judgment if they both fail to meet their burdens. *Id.*

◼◼ In this case, since the main issue in the determination of summary judgment is whether the Debtor received *reasonably equivalent value* in exchange for its transfers to the Defendant, this Court need not distinguish its analysis between subsections 5 and 6 since the *reasonably equivalent value* analysis under both subsections are the same. *See, e.g., In re Joy Recovery Technology Corp.*, 286 B.R. 54, 77 (Bankr.N.D.Ill.2002). Under the "fraud in law" provisions of the Illinois UFTA, the Plaintiff has the burden of proving the elements of "fraud in law" by a preponderance of the evidence. *In re Roti*, 271 B.R. 281, 294 (Bankr.N.D.Ill.2002) (stating that under Section 548 of the Bankruptcy Code, which provides for a federal conveyance cause of action, the trustee has the burden of establishing that the transfers were made for less than reasonably equivalent value). Accordingly, the Plaintiff bears the burden of proof as to the issue of *reasonably equivalent value. In re Crystal Medical Products, Inc.*, 240 B.R. 290, 300 (Bankr.N.D.Ill.1999) (stating that the Committee, which was seeking summary judgment in the adversary proceeding to avoid a fraudulent transfer, bears the burden of proof as to the issue of reasonably equivalent value and as to other elements of Section 548). *See also In re Joy Recovery Technology Corp.*, 286 B.R. at 73 (stating that the complainant has the burden of proving that the transfer in question was made for less than reasonably equivalent value). Once the Plaintiff has met his burden, there is a conclusive presumption

of fraud until the Defendant can rebut this presumption. *Regan v. Ivanelli*, 246 Ill. App.3d 798, 804, 187 Ill.Dec. 351, 617 N.E.2d 808 (2d Dist.1993).

◼ The Illinois Courts have not conclusively defined *reasonably equivalent value* under the Illinois UFTA. *In re Roti*, 271 B.R. at 303, *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir.1998). Since the Illinois UFTA is analogous to Section 548 of the Bankruptcy Code, 11 U.S.C. § 548, courts analyzing the Illinois UFTA have relied on cases addressing Section 548 in their analysis of the Illinois Statute. *In re Roti*, 271 B.R. at 301 (stating that Section 548 is analogous to the Illinois UFTA; thus, the court can look at Section 548 cases in analyzing cases under 740 ILCS 160/1 et seq.); *In re Crystal Medical Products, Inc.*, 240 B.R. at 299 (stating that "reasonably equivalent value" is interpreted in the same way under both Section 548 and the Illinois UFTA.); *In re Image Worldwide Ltd.*, 139 F.3d at 577 ("as its title indicates, the UFTA is a uniform act, and it derived the phrase 'reasonably equivalent value' from 11 U.S.C. § 548(a)(2). Thus, we can look to interpretations of 'reasonably equivalent value' from § 548 cases . . . .").

◼ In general, Illinois state and Bankruptcy Courts have not set forth specific requirements or factors they consider in determining whether a debtor received reasonably equivalent value for the transfer in question. However, *In re Roti*, an Illinois state court decision, the court referred to four factors in determining whether reasonably equivalent value was received.

> The factors utilized to determine reasonably equivalent value are: (1) whether the value of what was transferred is equal to the value of what was received; (2) the market value of what was trans-

ferred and received; (3) whether the transaction took place at an arm's length; and (4) the good faith of the transferee.

*In re Roti*, 271 B.R. at 295, 300. The *Roti* Court cautioned; however, that "[t]here is no fixed formula for determining reasonable equivalence, but will depend on all the facts of each case, an important element being fair market value." *Id.* at 295. In noting that Illinois courts lack a clear definition for reasonably equivalent value, the *Roti* Court noted that "[t]he Illinois Supreme Court, in discussing a prior statute, has stated that one of the necessary elements to establish a fraudulent conveyance is that 'there must be a transfer made for no or inadequate consideration.'" *Id.* at 303 (Citing *Gendron v. Chicago & North Western Transp. Co.*, 139 Ill.2d 422, 438, 151 Ill.Dec. 545, 564 N.E.2d 1207 (1990)). Furthermore, the court noted that "[t]he Illinois Appellate Court has since implied that there is no 'reasonably equivalent value' when there is 'no or inadequate consideration.'" *Id.* at 303. (Citing *Regan v. Ivanelli*, 246 Ill.App.3d 798, 805, 187 Ill. Dec. 351, 617 N.E.2d 808 (Ill.App. 2 Dist. 1993)).

■ There were several other cases addressing reasonably equivalent value which were specifically relied on by the parties. These include *In re Image Worldwide, Ltd.; In re Crystal Medical Products, Inc.;* and *In re Joy Recovery Technology Corp.* The Court in *In re Image Worldwide* analyzed reasonably equivalent value with respect to a scenario where the debtor received no direct economic benefit for its transfer, but may have received indirect benefits. The *Image Worldwide* Court recognized that "courts performing a fraudulent transfer analysis have been increasingly willing to look at whether a guarantor received indirect benefits from the guarantee...." *In* 

*re Image Worldwide, Ltd.*, 139 F.3d at 578. The Court held that so long as an indirect benefit to the debtor is fairly concrete, it may be considered in the reasonably equivalent value inquiry. *Id.* at 578–79 (stating that goodwill and "increased ability to borrow working capital" were examples of concrete indirect benefits). However, the court cautioned that while a debtor may have received an indirect benefit in exchange for a transfer, it does not necessarily follow that the debtor also received reasonably equivalent value, since indirect benefits are only a part of the reasonably equivalent value analysis. *Id.* at 582 (holding that while the debtor received an indirect benefit from guaranteeing an affiliate's loan under the parties' loan agreement, no reasonably equivalent value was received because in paying off the affiliate's loan, the debtor bankrupted itself).

■ The court in *In re Crystal Medical Products, Inc.*, also addressed the issue of reasonably equivalent value with respect to indirect benefits. Although it did not list specific factors as did the *Roti* Court, this Court noted that in determining whether a transfer is for reasonably equivalent value, "the Court must consider the circumstances surrounding the transfer." 240 B.R. at 300. The court further noted that, as a general rule, there is no reasonably equivalent value where a transfer was made in exchange for a benefit to a third party. *Id.* However, the court found that there is an increasing willingness by courts to give consideration to whether the debtor received an indirect benefit, so long as that indirect benefit was "fairly concrete." *Id.* The court further emphasized that "there is a willingness by courts to consider the benefits more holistically and look at the overall effect on the entity making the transfer." *Id.* at 300–01 (noting, for example, that "an indirect benefit was also found when the guarantee of a

debt resulted in the strengthening of the corporate group as a whole, and indirect benefits may also include intangibles such as goodwill or the relationship between affiliates"). *In re Joy Recovery Technology Corp.*, adds that "the determination of value is looked at from the vantage point of the debtor's creditors. (Citations omitted). Thus, the inquiry focuses on what did the debtor give up and what did it receive that could benefit the creditors." 286 B.R. at 75.

Finally, in the analysis of reasonably equivalent value it is necessary to keep in mind that "reasonably equivalent value is a question of fact that must be evaluated as of the date of the transaction." *Id.* at 75. *See also In re Roti*, 271 B.R. at 295, 303; *In re Crystal Medical Products, Inc.*, 240 B.R. at 300; *In re Image Worldwide, Ltd.*, 139 at 576. As the *In re Joy Recovery* Court cautioned, "Courts will not look with hindsight at a transaction because such an approach could transform fraudulent conveyance law into an insurance policy for creditors." *In re Joy Recovery Technology Corp.*, 286 B.R. at 75.

In this case, in their Motion for Summary Judgment, the Plaintiff argues that JCL did not receive *reasonably equivalent value* in exchange for the transfer and that the Defendant violated his fiduciary duty as an officer of JCL. Specifically, the Plaintiff argues that JCL did not receive *reasonably equivalent value* from the Defendant because the Defendant underpaid JCL by $2M by overvaluing JG. According to the Plaintiff, the Defendant did this so that he could provide the minimum re-quired pay-down of $1M (as stipulated by the agreement with Saranow which provided that "an affiliate of DJJ[1] shall have paid at least $1,000,000 in cash to the Company"). The Plaintiff contends that the Defendant's pay-down of only $1M was insufficient to restore JCL's financial health. Thus, according to the Plaintiff, the Defendant acted so as to benefit himself to the detriment of JCL and its creditors.

The Plaintiff further argues that, pursuant to *Falcon v. Thomas*, 258 Ill.App.3d 900, 196 Ill.Dec. 244, 629 N.E.2d 789 (4th Dist.1994), the Defendant has failed to meet his burden of proof. Specifically, the Plaintiff, in relying on *Falcon*, stated that since the transaction in question was between a corporation and its principal stockholder, the "defendant has the burden of showing by 'clear and satisfactory proof' a valid and subsisting debt which would be enforced and payment for which would be expected regardless of debtor's fortune or misfortune." *Id.* at 910, 196 Ill.Dec. 244, 629 N.E.2d 789.[2]

In arguing that the Defendant carries the burden of proof, the Plaintiff also contends that this would be consistent with Illinois corporate law, which requires a principal stockholder to prove the fairness of a transaction between himself and his corporation. Further, the Plaintiff states that the Defendant owed a fiduciary duty to JCL's creditors because he was a principal with special knowledge of the ongoings of JCL which were unknown to creditors. The Plaintiff continues, stating that the Defendant should have fairly set the price of JG, and repaid $3M as his pay-down,

---

1. "DJJ" as referenced in the Agreement with Saranow refers to the Defendant D. James Jumer.

2. However, an examination of *Falcon* reveals that the language relied on by the plaintiff from the *Falcon* case refers to cases "where the challenged transaction involves an immediate family member as a preferred creditor." *Id.* It is not clear from the Plaintiff's Motion how this fits into a *reasonably equivalent value* analysis.

rather than the $1M he actually paid because he had a fiduciary duty to do so.[3]

The Defendant argues that JCL did indeed receive at least *reasonably equivalent value* in exchange for its transfer of its non-hotel assets to the Defendant. In his Motion, the Defendant urges the Court to analyze the transfer holistically and without hindsight pursuant to *In re Crystal Medical Products* and *In re Joy Recovery*. The Defendant first argues that JCL received *reasonably equivalent value* because, in exchange for transferring non-hotel assets with a face value of $4,497,652, it received: JG which was valued by the Defendant's appraiser at $4,500,000, the Peoria parcels valued at $100,000, elimination of $168,000 rent per year on the Galesburg property, $1,000,000 pay-down from the Defendant, and $2,000,000 for Saranow's purchase of the 30% interest in JCL. In addition, the Defendant argued that JCL received indirect benefits because its new financial structure, as a result of the transactions, made it more attractive to investors and financiers.

The Defendant further argues that despite the difference between the value of the Defendant's appraisal and that of the Plaintiff's, there is no factual issue to resolve because JCL received *reasonably equivalent value* even if this Court were to rely on the Plaintiff's appraisal of JG at $2,100,000. The Defendant argues that looking at the transfers holistically, JCL received *reasonably equivalent value* even if JG was worth only $2,100,000 because it received: JG at a value of $2,100,000, the Peoria parcels valued at $100,000, elimination of $168,000 rent per year for the Galesburg property, $1,000,000 pay-down from the Defendant; and $2,000,000 from Saranow for its purchase of a 30% interest in JCL; whereas, the Defendant received non-hotel assets with a combined value of $1,639,614. The Defendant arrives at this conclusion by contending that despite the fact that the non-hotel assets he received in the transfer were worth almost $4,500,000, the true value of those assets was only $1,639,614, because, as discussed *supra*, a substantial portion of the receivables he received for the transfer were mostly worthless because the receivable from JSC was only worth $16,000–17,000 despite its face value of $2,767,545.

■ In determining if the Debtor received *reasonably equivalent value*, the valuation of JG is a critical starting point. Assuming, but not so finding, that its value is as alleged by the Plaintiff, $2,100,000, the following calculation can be made:

Transfers to Defendant

| | | | |
|---|---|---|---|
| JSC Accounts Receivable | $2,767,595 | | |
| Other Accounts Receivable | 1,459,110 | | |
| Cash Value Life Insurance | 100,504 | | |
| Three Automobiles | 64,000 | $4,391,209 | $4,391,209 |

**3.** Despite the fact that Illinois law imposes on principals a heightened duty in his dealings with his own corporation, this rationale seems to be outside the scope of a motion for summary judgment on the issue of *reasonably equivalent value*. Other case law specifically dealing with the issue of *reasonably equivalent value* has clearly held that the plaintiff has the burden of proving that the debtor did not receive *reasonably equivalent value*. Even cases involving allegedly fraudulent transactions between a principal and his corporation have not shifted the burden of proof onto the defendant. *See In re Joy Recovery Technology Corp.*, 286 B.R. 54 (Bankr.N.D.Ill.2002). Thus, the case law does not support the Plaintiff's position that the Defendant has the burden of proof.

Transfers to JCL

| Direct by Defendant | | |
|---|---|---|
| JG | $2,100,000 | |
| Peoria Parcels | 100,000 | |
| Cash Payment | 1,000,000 | $3,200,000 |
| Indirect | | |
| Saranow Investment | $2,000,000 | |
| Cancellation/Lease Payment | 168,000[4] | $2,168,000 |
| Total Direct and Indirect Transfers to JCL | | $5,368,000 [5] |

This calculation shows that through direct and indirect payments that JCL received more than it transferred to the Defendant and that it did receive *reasonably equivalent value.*

An even stronger conclusion is reached if the value of the JSC accounts receivable is reduced to $17,000.[6] The calculation of *reasonably equivalent value* would then be as follows:

Transfers to Defendant

| JSC Accounts Receivable | $ 17,000 | | |
|---|---|---|---|
| Other Accounts Receivable | 1,459,110 | | |
| Cash Value Life Insurance | 100,504 | | |
| Three Automobiles | 64,000 | $1,650,614 | $1,650,614 |

Transfers to JCL

| Direct by Defendant | | |
|---|---|---|
| JG | $2,100,000 | |
| Peoria Parcels | 100,000 | |
| Cash Payment | 1,000,000 | $3,200,000 |
| Indirect | | |
| Saranow Investment | $2,000,000 | |
| Cancellation/Lease Payment | 168,000 | $2,168,000 |
| Total Direct and Indirect Transfers to JCL | | $5,368,000 [7] |

In conclusion, giving the greatest weight to the Plaintiff's figures, JCL received more in direct and indirect payments than what the Defendant got. Using the Plaintiff's figures as to the value of JG and the Defendant's figures as to the value of the JSC account receivable, JCL received substantially more, in direct and indirect payments, than it gave.

In addition to the mere numbers, this Court also needs to examine the surround-

4. This is just for one year, over the life of the lease it would have even greater value. But as there was no evidence from which a further calculation can be used, this amount will be used.

5. This calculation does not include that JCL received an indirect benefit because its improved financial structure made it more attractive to investors and financiers, and, accordingly enhanced its ability to borrow working capital.

6. When the cross motions for summary judgment were argued, the Defendant took the position that the value was $16–17,000 and the Plaintiff did not contest this assertion. In addition, both parties indicated there were no questions of fact.

7. See footnote # 5.

ing circumstances: Was the transaction an arm's length one, was it in good faith, and as the Defendant was an insider, was it fair to JCL? There is nothing before this Court to indicate that the Defendant, an insider, acted other than in good faith, and that the transaction was not fair to JCL. It is also highly unlikely that both JCL's primary lender and Saranow would permit the Defendant to receive assets from JCL which exceeded the value of the assets it was receiving. To permit such would only decrease the assets which the banks could look to satisfy the loans, or decrease the value of Saranow's investment.

For these reasons, this Court finds that JCL received *reasonably equivalent value* and that there were no fraudulent conveyances. This Opinion constitutes this Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052. A separate Order will be entered.

### ORDER

For the reasons stated in an Opinion filed this day, IT IS HEREBY ORDERED that:

1. The Plaintiff's Motion for Summary Judgment is DENIED.

2. The Defendant's Motion for Summary Judgment is ALLOWED.

3. Judgment is entered for the Defendant and against the Plaintiff.