**In re HENNINGS FEED AND CROP CARE, INC., Debtor.**

**Roger W. Stone, Trustee, Plaintiff,**

**v.**

**Ottawa Plant Food, Inc., Defendant.**

Bankruptcy No. 99–72801.
Adversary No. 01–7091.

United States Bankruptcy Court,
C.D. Illinois.

March 30, 2007.

See also 365 B.R. 893, 2007 WL 1098637.

Jeffrey D. Richardson, Decatur, IL, for Plaintiff.

Mark R. Sargis, Chicago, IL, Stephen A. Tagge, Thomas H. Wilson, Springfield, IL, for Defendant.

MARY P. GORMAN, Bankruptcy Judge.

## OPINION

The issue before the Court is whether numerous sales of agricultural chemicals made by the Debtor, Hennings Feed and Crop Care, Inc. ("Hennings") to the Defendant, Ottawa Plant Food, Inc. ("Ottawa") at deeply-discounted prices were fraudulent conveyances. For the reasons set forth below, the Court finds that such sales occurring after May, 1998, were fraudulent conveyances and that the Plaintiff, Roger W. Stone, as Trustee of the Hennings bankruptcy estate, is entitled to a judgment against Ottawa in the amount of $522,579.61 plus pre-judgment interest and costs of suit.

Hennings was an agricultural business that supplied chemicals, plant food, livestock feed, and other agricultural products to farmers. Hennings also provided related services to its customers such as advice on the proper chemicals to use and the labor and equipment to apply the chemicals on farm fields. The business began in 1980 and was located in Shelbyville, Illinois. Hennings was owned by Larry Hennings and his wife, Marissa Hennings.

Because Hennings sold to end-users such as farmers and had a retail outlet for the sale of its products, Hennings was a "dealer" in the agricultural chemical supply chain. In the normal supply chain, dealers purchase products from distributors who, in turn, have purchased the products from the manufacturers. Henning sold products made by a variety of manufacturers and principally purchased through large distributors such as United Suppliers, Van Diest, and UAP.

In the mid–1990s, Larry Hennings began noticing that some of his dealer competitors were selling products at lower prices than his company was able to match, notwithstanding the fact that most dealers purchased through the same distributors from a fixed price list. As a result of a discussion Larry Hennings had with one such competitor, Mr. Hennings decided to try to maximize Hennings' revenues by increasing sales, thereby qualifying for larger manufacturer and distributor rebates. In the normal supply chain, manufacturers and distributors have programs which provide rebates to dealers for the sale of products. The amounts of rebates vary based on the manufacturer, the distributor, the product, the quantity of product sold, and other factors.

Hennings began increasing its credit purchases from its suppliers such as Unit-

ed Suppliers and Van Diest and began selling products to other dealers and to brokers rather than simply to farmers. Brokers operate in the agricultural chemical market outside of the normal manufacturer-to-distributor-to-dealer supply chain and buy and sell products without the prospect of receiving rebates on their sales. Hennings sold the products to the other dealers and brokers at discounted prices, generally in the range of 70% of its cost. By 1998, Hennings had increased annual sales dramatically and the business had gone from virtually all sales to farmers to almost 80% of sales to other dealers or to brokers.

Not surprisingly, Hennings was unable to make a success of its new business model and, in 1999, filed Chapter 11 bankruptcy. Larry Hennings was very quickly removed from management and, ultimately, Roger W. Stone was appointed Trustee. After reviewing Hennings' books and records, the Trustee filed fraudulent conveyance complaints against several entities which had made the discounted purchases from Hennings. The other cases have been resolved, and Ottawa is the remaining defendant against whom a judgment is sought based on a fraudulent conveyance theory.

Ottawa is both a dealer and a distributor of agricultural chemicals. In addition, through the activities of its president, Steve Strong, Ottawa also brokers agricultural chemicals. Ottawa has been in business since 1989 and was previously known as Strong & Strong.

The case was tried over a period of several weeks last year and the parties engaged in extensive post-trial briefing. ■ A trustee may recover fraudulent conveyances made by a debtor by the use of state law or the Bankruptcy Code. 11 U.S.C. § 544(b)(1); 11 U.S.C. § 548; *In re Image Worldwide, Ltd.*, 139 F.3d 574, 576–77 (7th Cir.1998). The Trustee has filed his Complaint here relying on the Illinois Fraudulent Transfer Act ("Act"), 740 ILCS § 160/1 *et seq.* Specifically, the Trustee relies on Section 5 of the Act which provides in part:

**160/5. Transfer or obligation fraudulent as to creditor—Claim arising before or after transfer**

§ 5. (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or

(2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

740 ILCS § 160/5(a).

The Trustee also relies on Section 6 of the Act which provides in part:

**160/6. Transfer or obligation fraudulent as to creditor—Claim arising before the transfer**

§ 6.(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably

equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

740 ILCS § 160/6(a).[1]

The cause of action under § 5(a)(1) of the Act is for actual fraud, often referred to as "fraud in fact". To prevail on this cause of action, the Trustee must prove that the transfers in question were made by Hennings with the actual intent to hinder, delay, or defraud its creditors. *In re Martin*, 145 B.R. 933, 946 (Bankr.N.D.Ill.1992); *In re Knippen*, 355 B.R. 710, 721 (Bankr.N.D.Ill.2006). Section 9(a) of the Act provides a defense to the claim of fraud in fact. Transfers otherwise voidable as fraud in fact are not voidable "against a person who took in good faith and for a reasonably equivalent value[.]" 740 ILCS § 160/9(a).

Constructive fraud or "fraud in law" is the cause of action set forth in § 5(a)(2) of the Act. Establishing fraud in law does not require proof of actual intent to defraud. *General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1079 (7th Cir.1997); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.1995). Rather, transfers made for less than reasonably equivalent value, leaving a debtor unable to meet its obligations, are deemed or presumed to be fraudulent. *In re Zeigler*, 320 B.R. 362, 374 (Bankr.N.D.Ill.2005). Generally, to prove fraud in law under § 5(a)(2), the Trustee must prove that Hennings made voluntary transfers without receiving reasonably equivalent value and that the transactions injured Hennings' creditors because Hennings was left after the transactions with insufficient assets to pay its debts. *General Electric Capital Corp. v. Lease Resolution Corp.*, *supra*, 128 F.3d at 1079.

Section 6(a) of the Act provides an additional cause of action for fraud in law. To bring an action under this section, the Trustee must prove that a creditor's claim arose before the transfers in question, the transfers were made without receiving reasonably equivalent value in exchange, and that Hennings was insolvent or became insolvent as a result of the transfers. *In re Joy Recovery Technology Corp.*, 286 B.R. 54, 77 (Bankr.N.D.Ill. 2002); *In re Roti*, 271 B.R. 281, 304 (Bankr.N.D.Ill.2002). As with a § 5(a)(2) claim, no proof of actual intent to defraud is required to establish fraud in law under § 6(a).

Generally, the trustee bears the burden of proof on all issues necessary to establish a fraudulent conveyance either as fraud in fact or fraud in law. *In re Zeigler*, *supra*, 320 B.R. at 372, 374. There is some dispute about the standard of proof required to prove actual fraud in a fraud in fact case. Some courts hold that the elements of actual fraud must be proven by clear and convincing evidence, while others have been reluctant to hold a trustee to this higher standard. *Id.* at 372–73 (clear and convincing proof required); *In re McCook Metals, L.L.C.*, 319 B.R. 570, 587, *n. 11* (Bankr.N.D.Ill.2005)(standard for proof of actual fraud under § 5(a) of the Act is not necessarily clear and convincing because Illinois courts have not yet ruled on the issue). Having reviewed the cases, this Court finds that clear and convincing proof must be presented to establish actual fraud under § 5(a). It should also be not-

1. Actually, the Trustee filed a one-count Complaint which is captioned as being brought under 740 ILCS §§ 160/5 and 160/6. No references are made in the Complaint to the specific subsections of either § 5 or § 6 which might support the Trustee's position. Fed. R.Civ.P. 10(b) would generally require that separate causes of action based on distinct theories be set forth in separate counts.

ed, however, that in fraud in fact cases, the issue of whether reasonably equivalent value has been paid by the transferee is an affirmative defense raised by the defendant and, therefore, the defendant bears the burden of proof on that issue. *Scholes v. Lehmann, supra,* 56 F.3d at 759; *In re Spatz,* 209 B.R. 907, 909–10 *n. 3* (Bankr. N.D.Ill.1997), *aff'd in part, rev'd in part,* 222 B.R. 157 (N.D.Ill.1998). The standard of proof for the defendant is preponderance of the evidence. In the fraud in law causes of action, the trustee's burden is to establish the elements of each cause of action by a preponderance of the evidence. *In re Joy Recovery Technology Corp., supra,* 286 B.R. at 73; *In re Martin, supra,* 145 B.R. at 946.

### *Actual Fraud—Fraud in Fact— 740 ILCS § 160/5 (a)(1)*

■■■■■ Proof of actual intent to hinder, delay, or defraud is necessary to establish fraud in fact. *In re Martin, supra,* 145 B.R. at 946; *In re Knippen, supra,* 355 B.R. at 721. The only witness at trial who knew what really occurred at Hennings was Larry Hennings. The intent of corporate officers and managers controls the intent of a corporation. The conduct of insiders may be imputed to the corporation. *In re H. King & Associates,* 295 B.R. 246, 285 (Bankr.N.D.Ill.2003); *In re Roco Corporation,* 701 F.2d 978, 984 (1st Cir.1983); *In re Anchorage Marina, Inc.,* 93 B.R. 686, 691 (Bankr.D.N.D.1988).

■■■■ During his testimony, Larry Hennings described his desire to increase the profits of Hennings and his plan to increase revenues by selling to other dealers and brokers rather than just to farmers. He testified that he sold products to the other dealers and brokers at significant markdowns—generally in the range of 70%—from the list prices he paid to suppliers to obtain the goods. He admitted that he had hoped to make up the differ-

ence through rebates, free product, so-called "re-sprays", and other incentives from the manufacturers and distributors. He further admitted that the written programs Hennings participated in with the manufacturers and distributors did not provide for such significant rebates or other compensation to make up these differences. Rather, he had unwritten side deals that he thought would provide the additional revenue.

Larry Hennings admitted that he was aware that the written programs for manufacturer rebates generally limited the payment of rebates to sales to farmers or other end-users. He stated that, after he entered his company into such programs, he "went out to dinner" with the sales representatives to discuss side deals which might enhance revenues. Larry Hennings knew that the manufacturers were not obligated to pay rebates on his sales to other dealers or to brokers, but he thought he would not get caught and could collect the rebates anyway. He suggested that his sales volume grew so dramatically over just a few years that it was obvious that he could not just be selling to his usual farm clientele—there were neither enough farmers nor enough acreage in his sales territory to support the use of so much chemical product. During cross-examination, counsel for Ottawa described Hennings' relationship with manufacturers' representatives on the rebate issue as "don't ask, don't tell" and Mr. Hennings agreed that was a fair characterization. Larry Hennings also agreed with Trustee's counsel that Hennings was on "thin ice" in trying to collect rebates for sales to brokers.

Larry Hennings also apparently thought Hennings could make some additional revenue on re-sprays. Occasionally, manufacturers provide free product to dealers when a farmer is dissatisfied with the orig-

inal application made by the dealer so that another application—or "re-spray"—can be made at no charge to keep the customer happy. The amounts of free product received by the dealer may exceed the amounts actually necessary to satisfy the customer and the dealer then has product to sell for which it had no cost. Larry Hennings provided no details of the amounts Hennings received from time to time for re-sprays. It is obvious, however, that there should have been no claims made by Hennings for re-spray products with respect to any of the products sold to other dealers or brokers. Because Hennings was not applying those products for the end-users, it would not have received the complaints from the end-users who ultimately bought and used the products from the other dealers or brokers. Hennings' legitimate claims for re-spray product should have gone down—not up—as business shifted away from sales to farmers. Nonetheless, Larry Hennings apparently intended, on behalf of Hennings, to try to increase the amount of free product obtained through re-spray claims.

Hennings' intent to collect rebates to which it was not entitled and to make apparently illegitimate claims for re-spray product clearly evidences an intent to defraud or scam manufacturers. The manufacturers were not, however, Hennings' creditors. To the contrary, Hennings was trying to become their creditor. In the process of scamming the manufacturers, however, Hennings went further and committed acts which establish its intent to actually hinder, delay, and defraud its own creditors, including several of its distributors and the Shelby County State Bank ("Bank").

The most obvious conduct of Hennings evidencing its actual intent to hinder, delay, or defraud its creditors was the creation of false invoices for the Ottawa sales and the related creation of a false, substantial, and, apparently, ever-increasing account receivable from Ottawa which was shown as an asset on Hennings' books. Larry Hennings admitted that, when Ottawa purchased product, Ottawa paid the amount due in full upon receipt of the product. Ottawa never bought on credit from Hennings and, accordingly, Hennings never had an account receivable due to it from Ottawa. Nevertheless, when Ottawa purchased product, Larry Hennings had his bookkeeper prepare documentation which reflected that the sale had been made at 102% or 103% of Hennings' cost and that the amount paid by Ottawa was simply a credit against what Ottawa owed. This resulted, over the course of several years, in the creation of a false multi-million dollar receivable which was reflected on Hennings' balance sheets, which were provided to the Bank to maintain Hennings' line of credit.

Larry Hennings testified that the false invoices and the receivable were created to keep track of what Hennings needed to recover in rebates or other incentives to break even. He hinted that he had discussed the accounting procedure with someone at the Bank, although he now recognized that it was a poor practice. This testimony made no sense. Hennings regularly used the services of an accounting firm and, if Mr. Hennings was looking for a way to keep track of legitimate receivables, he had access to the help he needed to create proper tracking methods. Instead, he never disclosed any of the activities involved in the discounted sales or the creation of false invoices and false receivables to his accountant. The accountant prepared compilation financial reports for the Bank using the phony numbers in the belief that they were legitimate. The accountant, Brent Lively, testified that he had been "hoodwinked" and the Court agrees. The documents were obviously created for the purpose and with

the intent that the Bank would rely on the phony numbers and continue to extend credit to Hennings. The credit was needed to finance the continued purchasing of products to be sold at the deep discounts.

Hennings also had the actual intent to hinder, delay, or defraud it distributor creditors. Hennings bought the products on credit from the distributors. According to Hennings' bookkeeper, Gina Graham, Hennings' employees, in some instances, made an effort to make sure Ottawa trucks picking up product were not at the loading docks when certain distributors were delivering. Larry Hennings admitted that Hennings took delivery of the products directly at its facility rather than having them shipped to Ottawa in order to avoid "reg flags". Larry Hennings was apparently, and rightfully, concerned that distributors would not sell in the same amounts and on the same terms if the distributors knew what was going on with the product sales. Mr. Hennings made actual efforts to prevent distributor creditors from learning the full story about Hennings' business.

The Trustee testified that, in reviewing Hennings' records after the bankruptcy filing, he discovered other evidence of fraud designed to hinder, delay, or defraud creditors. He found records of purported receivables from farmers which had been submitted to the Bank for factoring purposes which were fake and, in some cases, related to non-existent farmers or had false addresses. He also found other entries in the receivables category which showed money due from manufacturers for "product return" which were phony.

The above-described conduct of Hennings evidences, clearly and convincingly, Hennings' intent to actually hinder, delay, and defraud its creditors. It is also important to consider, however, when this conduct occurred. Limited evidence was presented which allows the Court to put Hennings' acts in any sort of time frame. Although the actions to at least hinder and delay the Bank and the trade creditors might well have begun as early as 1997, the Court finds that the financial statements from May, 1998, provide clear and convincing evidence of that intent. The phony Ottawa receivable was in excess of $3,000,000 at that time and Hennings began including, in addition, a new line item on its financial statement showing more than $6,000,000 due from the chemical manufacturers. Brent Lively testified that the new line item was added because Hennings was beginning, at that time, to factor its receivables with the Bank. Hennings needed the Bank and trade credit to continue buying from suppliers and selling at discount to Ottawa and others. The false financial statements were an integral part of Hennings' continued ability to make the sales transactions with Ottawa. The Trustee has met his burden of proof on the issue of actual fraud, although, as will be discussed further below, the Court will limit damages to sales occurring after May, 1998.

 Ottawa has raised the defenses of good faith and payment of reasonably equivalent value.[2] 740 ILCS § 160/9(a). The issue of whether Ottawa acted in good faith was never really in dispute. Steve

---

**2.** Ottawa filed an Answer to the Trustee's Complaint and filed several affirmative defenses, including good faith and the payment of reasonably equivalent value. Perhaps because the Trustee failed to plead in separate counts, Ottawa failed to specifically state that these affirmative defenses were raised in response only to the specific allegations of actu-

al fraud. In its post-trial brief, Ottawa accuses the Trustee of trying to manipulate the burden of proof by referring to Ottawa's defenses as affirmative defenses. Later, in its Supplemental Proposed Conclusions of Law, however, Ottawa admits that it has the burden of proof on reasonably equivalent value as an affirmative defense to actual fraud.

Strong, president of Ottawa, testified that he never met Larry Hennings in person and only dealt with him over the phone. There was no social or personal relationship between the principals of the companies. Each transaction was arm's length in the sense that the parties negotiated over the phone and either made or did not make a deal based on product availability and price. Steve Strong did not personally keep track of how much he was buying from Hennings, and he had no knowledge of how Hennings was able to offer such low prices. Ottawa met its burden of proving good faith and the Trustee provided no contrary evidence.

Whether Ottawa paid reasonably equivalent value for the purchases from Hennings was identified by both parties in opening argument as the real key to this case. The bulk of the trial and witness testimony focused in one way or another on this issue.

"Reasonably equivalent value" is a term used in the Act and in the parallel Bankruptcy Code provisions but is not defined in either statute. The Seventh Circuit has said that the determination of reasonably equivalent value is not made by a fixed mathematical formula but, rather, by a comparison of the value of what was transferred to the value of what the debtor received in exchange. *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997). In comparing the value of what was transferred and received, courts should consider the fair market value of what was transferred and received. *Id.*

Because the Trustee has the burden of proof on this issue under the constructive fraud theories, the Trustee presented evidence on this issue in his case in chief. The Trustee presented evidence as to what Hennings had paid for the products sold to Ottawa. The Trustee's figures came from distributor price lists and Hennings' records. The Trustee completed a spread sheet showing his calculation of the price of the goods sold for each transaction. Although Ottawa criticized the Trustee's methodology and suggested efforts the Trustee should have made to verify his numbers, Ottawa presented no evidence that the Trustee's numbers were actually wrong. Ottawa made a big deal of the fact that the Trustee was unable to match a supplier invoice to each Ottawa sale. Ottawa's criticism related to the form rather than substance of the Trustee's calculations and, as such, had limited value. If the supplier prices used by the Trustee were actually wrong, Ottawa would have known that because the prices were from published lists and Ottawa could have easily rebutted the Trustee's calculations. In the absence of such contrary evidence, the Trustee's calculations of the prices paid by Hennings will be considered to be accurate.

In pre-trial motions, the Trustee argued that the measure of reasonably equivalent value is whether a debtor at least breaks even on a sale. The Court rejected that argument, finding that the price a debtor has paid may well be evidence of value, but it is not always fully determinative of value. What a debtor paid for goods would be evidence of value for a subsequent sale of those goods if the circumstances of the debtor's purchase evidence that the debtor paid fair market value and the timing of the subsequent sale is sufficiently close so that fair market value would not have changed. After considering all the evidence presented at the trial, the Court finds that, in this case, the price paid by Hennings to its suppliers does represent the fair market value of the goods and, therefore, is the starting point in determining whether reasonably equivalent value was paid.

Hennings bought the goods in the open market in arm's length transactions from

suppliers who regularly sold goods to similarly-situated dealers. Hennings paid the advertised, published prices for the goods. Hennings was a willing buyer purchasing from a willing seller with no compulsion or duress impacting either party. Hennings' subsequent sale of the goods to Ottawa was often immediate. The suppliers' delivery trucks were often still at Hennings when Ottawa trucks arrived to pick up the goods. All of these factors lead to the conclusion that the fair market value of the agricultural products Hennings sold to Ottawa was the price Hennings paid for the goods.

To counter the Trustee's position, Ottawa presented evidence of two types to try to establish that it had paid reasonably equivalent value. First, Ottawa presented testimony about rebates, re-sprays, and other incentives. Ottawa's position was that these incentives essentially reduced Hennings' purchase price or cost of goods sold and, therefore, the availability of these incentives must be considered when calculating the value of what was transferred and received.

Second, Ottawa attempted to present evidence of comparable purchases to show that, regardless of what Hennings paid for the goods, the same goods were available elsewhere in the marketplace for the prices Ottawa paid Hennings for them. Ottawa's theory was that, if the goods were available in the marketplace for the prices paid by Ottawa, then those prices, rather than the prices paid by Hennings to its suppliers, reflect the value of the goods and should be used to determine whether reasonably equivalent value was paid.

Ottawa presented extensive testimony about rebates from which the Court concludes that published rebate programs were offered by most manufacturers and distributors with the amounts of rebates varying from 5% or 6% on the low end to 20% or more on the high end. These published programs provided rebates for sales to farmers or other end-users and generally did not include rebate payments for "sideways" sales to other dealers or brokers. Although the purpose of rebates is to encourage product sales, with consumable products such as agricultural chemicals, the incentive must be to get the products sold and actually used rather than just moved around in the marketplace. Only sales to end-users such as farmers meet that goal. Some manufacturers were more vigilant than others about checking sales records before paying rebates. As counsel for Ottawa put it, some dealers like Hennings considered compliance with the terms of the programs to be on a "don't ask, don't tell" basis.

Further, the Court learned that, in addition to the published programs, some manufacturer and distributor representatives often had unwritten rebate or incentive programs which were sometimes referred to as "in the black box." These programs provided additional money or product for meeting sales goals, but the amounts paid were always discretionary. Thus, there was no particular way of enforcing any entitlements a dealer expected under these programs.

The Court heard testimony about a variety of programs, some of which increased rebates when several products from the same manufacturer were "paired" and sold together, or when a farmer was convinced to switch from a competitor and purchase a manufacturer's entire line of products. The Court also heard about the possibility to get free product to re-spray a farmer's fields if the initial application had been unsatisfactory, and the occasional delivery of free product to dealers who were meeting high sales goals.

Ottawa's theory was that the rebates and free product actually reduced Hennings' cost of goods sold. Thus, Ottawa

suggests that Hennings' actual cost to acquire the goods must be calculated by deducting these incentives from the initial price paid. Ottawa further asserts that the incentives were so substantial that Hennings' true cost of the goods sold was lower than the price Ottawa paid and, therefore, there were no fraudulent conveyances. Ottawa's theory is flawed.

Ottawa's witnesses testified very generally about rebate programs available in the late 1990s. Although many of the witnesses appeared quite knowledgeable about the programs, little was presented as far as any specifics which might justify rebate claims by Hennings, or the Trustee on its behalf, for sales to Ottawa or other dealers or brokers. The Trustee did, however, introduce a 1999 DuPont Ag Retailer Incentive Program document into evidence. Many of the chemicals listed on the document are those that Hennings sold to Ottawa. The document lists as its first criteria for earning incentive payments that the dealer is to "[p]romote and sell DuPont products to farmers." All of the other criteria are related to service to farm customers and the available rebates are not guaranteed in specific amounts but are simply stated as being "up to 15%." Thus, even the published programs were based on subjective criteria and may not have provided a guaranteed rebate amount.[3]

Larry Hennings admitted that, once he got into trouble, the representatives who had promised him the additional rebates "ran for cover" and left him with no recourse. Many witnesses testified that dealing in the sideways market was complex. Larry Hennings admitted that ven-

turing into this area of sales was a territory where one could get "burned." James Caruso, a witness called by both parties, testified that he was a dealer who made some sales to other dealers and brokers but he did so cautiously and on a limited basis. He testified that, on one occasion, he learned that a product was being sold on a "2 for the price of 1" basis in Texas. He sent a truck to Texas, bought a truckload of the product, and made a tidy profit on the transaction. He testified that a dealer needs to look for those types of opportunities to make money in the agricultural chemical business.

Although several witnesses testified about the availability of re-spray programs, no one testified that Hennings should have been able to collect any volume of free product for re-sprays based on the products sold to Ottawa. Further, there was no testimony that the amount of free product which Hennings might have obtained based on sales volumes was significant or in any way related to the Ottawa sales.

Hennings was scamming manufacturers in its efforts to collect rebates and free product on the Ottawa sales. There is no credible basis to reduce the cost of goods sold by reason of these scams. There is simply no reason to suggest that the Trustee could have or should have continued Hennings' scheme and collected anything more than he actually did from manufacturers or distributors.

Ottawa's second theory on reasonably equivalent value is that there is evidence of comparable purchases made by Ottawa

---

**3.** Ottawa objected to the introduction of the DuPont document into evidence on the basis that it had not been authenticated by anyone from DuPont. The document had been found by the Trustee in Hennings' records and had been used by the Trustee in his analysis of damages. The Court admitted the document over the objection of Ottawa. The Court does not rely on the document here as the definitive or complete statement of how the 1999 DuPont program or any other rebate programs were structured. Rather, it is simply one example of a program which is consistent with the testimony of witnesses presented by both parties.

and others at the time of the purchases from Hennings which establishes that the same products were available in the marketplace from other sellers for the prices paid by Ottawa. Ottawa claims that these other sales provide evidence of the value of the products and establish that the prices paid by Ottawa were reasonably equivalent. To fully understand this defense, some further history is required.

The Trustee filed two other adversary complaints based on fraudulent conveyance theories against entities which had purchased agricultural products from Hennings under circumstances similar to Ottawa. The cases were filed against Snyder Trading, Inc. ("Snyder") and Craig Enterprises, Inc. ("Craig"). Craig demanded a jury trial and that trial commenced before Magistrate Judge Byron Cudmore in January, 2005.

During the jury trial, Craig's attorney attempted to introduce evidence of comparable purchases made by Craig from sellers other than Hennings. The Trustee objected, arguing that such evidence was irrelevant. Judge Cudmore entered a written Order allowing the evidence but imposing certain conditions as to the foundation that needed to be provided for the evidence to be admitted. Due to the fact that Craig's attorney was apparently unprepared to present the required foundational evidence, the jury trial was recessed. The Craig case settled shortly thereafter, as did the Snyder case.

In order to avoid surprises and to be sure of adequate preparation, Ottawa filed a written Motion in Limine in this case in November, 2005. Ottawa asked the Court to rule that its evidence of comparable purchases was admissible and relied on Judge Cudmore's Order to provide a framework of the issues to be considered. Ottawa agreed with the conditions set in the Craig case by Judge Cudmore that, in order for evidence of other purchases to be admitted, foundational evidence needed to be presented that each purchase was at arm's length, involved the same branded product, was of a similar quantity or volume, and had been made at the same time of year. Further, Ottawa agreed that the seller in each case had to be a "dealer", but requested that this Court broaden the definition of the purchaser for comparable transactions.[4] Ottawa asked this Court not to impose the same geographic limitations that Judge Cudmore had imposed on Craig and requested that this Court not require proof, as Judge Cudmore had, that the other seller's unit cost was the same as Hennings.

The Trustee objected to the admissibility of any comparable purchase evidence on the basis of relevance. Relying on *Scoles v. Lehmann, supra,* the Trustee argued that, if Hennings did not break even, it could not, as a matter of law, have received reasonably equivalent value. Further, the Trustee asserted that Judge Cudmore's Order was not binding on this Court and should not form a basis for admitting evidence in this case. Finally, the Trustee asserted that, if the Court were to allow the comparable purchase evidence, all of Judge Cudmore's conditions should be imposed.

This Court entered an Order on Ottawa's Motion in Limine ("In Limine Order")

4. In its Motion in Limine, Ottawa stated: "For a fifth condition, Judge Cudmore stated that a comparable transaction must be 'dealer sales to broker.' This condition would be more meaningful and appropriate if it required 'dealer sales to wholesaler or other non-end-user.'" In the absence of any other discussion in the Motion about limiting the seller in each sale to a dealer, the Court interpreted these statements by Ottawa as acquiescence in the condition that evidence of comparable purchases would be limited to those purchases where the seller was a dealer.

882

on January 4, 2006. The Court disagreed with the Trustee that all comparable purchase evidence was irrelevant. The Court held that the price paid by Hennings to its suppliers for the goods sold to Ottawa might well be evidence of the value of the goods, but was not necessarily the only evidence of value. Accordingly, evidence of other purchases in the marketplace could be admitted for the purpose of establishing value.

The Court also agreed that Judge Cudmore's Order from the Craig case was not binding on it, but further stated that it was helpful as a framework for outlining the foundation that needed to be laid for the admissibility of the comparable purchase evidence. Because Ottawa had conceded that many of the conditions imposed in Judge Cudmore's Order were reasonable and appropriate, this Court adopted those conditions. This Court ordered that any comparable purchase evidence must relate to purchases which had been made at arm's length, were of the same branded product, were of a similar quantity or volume, and had been made at the same time of year. Further, this Court ordered that, in each case, the seller of the product must be a "dealer" as that term was described in the In Limine Order. This Court described agricultural chemical dealers as those who "generally sell to end users of the products such as farmers and generally provide other related services such as advice on the proper chemicals to use as well as the labor and equipment to apply the chemicals purchased from the dealer. Dealers are the retailers of the agricultural chemicals." In Limine Order *at* pp. 2–3.

Ottawa had asked the Court to define the buyers in the comparable purchase transactions as "wholesalers" rather than "brokers" as Judge Cudmore had ordered. Understanding that the comparable purchase evidence Ottawa intended to introduce related only to purchases made by Ottawa, Snyder, and Craig, this Court agreed to define the buyers in relevant transactions as only those three named entities regardless of whether they were acting in a broker or other wholesale role at the time of purchase.

Judge Cudmore had limited the comparable purchase evidence to that of purchases from "Midwest" dealers. Ottawa argued that such a condition was too restrictive and ignored the true market which it suggested was more national. This Court agreed that comparable purchase evidence need not be initially excluded solely on the basis that the purchase was made from a dealer outside the Midwest. The Court opined, however, that such information was relevant and might be necessary to give weight to the comparable purchase evidence. Establishing some geographic proximity would ensure that the dealers involved were operating under similar market and weather conditions as Hennings. A dealer operating in an area where different crops are grown under different weather conditions could have a variety of different incentives to sell products at discounted prices which would make any suggested "comparable purchase" not quite so comparable.

Ottawa also requested that the Court refrain from imposing the requirement which Judge Cudmore had imposed on Craig to present evidence that the unit price that the other selling dealer had paid for the products was the same as Hennings. Ottawa argued that such a condition would be burdensome and, perhaps, impossible to meet. It would require Ottawa, Craig, and Snyder to go back to each entity from which they had purchased product and find out how much that entity had paid for the product. Such information simply might not be available. Further, Ottawa argued that what the other seller paid should not be controlling as to

the value of the goods. The Court agreed not to impose the condition as a threshold limitation on the presentation of evidence, but again opined that such information would add weight to the evidence. Again, the circumstances under which the other dealer was selling would be integral in determining whether the purchases were indeed comparable.

Along the same lines, the Court also advised the parties that "other evidence of the frequency and volume of sales between the selling dealers and Ottawa, Craig, or Snyder, while not required for initial admissibility, may be helpful in evaluating the evidence." In Limine Order *at* p. 11. The Court suggested that isolated or one-time sales from dealers might not be given the same weight as "regular or repeated sales from dealers similar to the Debtor."

Finally, the Court included the following in the In Limine Order:

> Ottawa requested in its Motion that the Court "admit evidence of comparable purchases." The Court cannot rule at this time on the admissibility of any particular evidence. The Court assumes that the evidence of comparable purchases will be presented through a combination of witness testimony and documents. The Federal Rules of Evidence will apply and all evidence must be presented in compliance with such Rules. The Court has determined at this time only that the evidence of comparable purchases can survive an objection of the Trustee as to its relevance. Nothing herein relieves either party from their obligation to present evidence in competent form in accordance with the Rules.

In Limine Order *at* p. 8.

With this background, Ottawa attempted to present evidence of comparable purchases at the trial. Ottawa began by trying to introduce evidence of comparable purchases made by Snyder through the testimony of Norman Snyder. An exhibit was identified by Mr. Snyder as having been prepared by his company to list what it deemed as purchases comparable to those it made from Hennings. The document had been prepared during the litigation against Snyder by the Trustee. The document listed information about the product purchased including the quantity, price, date of purchase, and seller's name.

After initially establishing the purpose for which the document was created, Ottawa's presentation on comparable purchases began to falter. Ottawa's counsel began to question Mr. Snyder about various entities other than Hennings listed as sellers on the exhibit in an effort to have Mr. Snyder identify the entities as "dealers" as required by the In Limine Order. The Trustee's counsel objected because no foundation had been laid as to Mr. Snyder's personal knowledge of the entities involved. The Court sustained the objection and it quickly became apparent that Mr. Snyder had limited personal knowledge about the entities and was unable to competently testify as to the nature of the businesses involved as sellers.

Ottawa's counsel was obviously unprepared for the Trustee's objection and, notwithstanding the Court's clear warning in the In Limine Order that evidence was to be presented in competent form, was unprepared to lay the foundational basis to prove that the sellers in the alleged comparable purchases were dealers. Counsel for Ottawa attempted to reargue the Motion in Limine, suggesting that the Court broaden the definition of sellers in the comparable transactions to include distributors and brokers. Somewhat disingenuously, Ottawa's counsel suggested that the Motion in Limine had been made "as an affirmative motion and not as a restrictive motion" and, thereby suggested that the In Limine Order did not limit what was admissible.

Ultimately, similar lists were presented as to Craig and Ottawa purchases and, through the testimony of a variety of witnesses, Ottawa was able to establish that some of the entities, other than Hennings, listed as sellers on the exhibits were dealers.[5] The process, however, was tedious as counsel asked numerous witnesses about their knowledge of the various entities in a way that clearly indicated that the witnesses had not been previously prepared to testify on the issue. Lack of evidence about which sellers to Snyder, Craig, and Ottawa were dealers turned out, however, to be only one of Ottawa's problems in presenting its comparable purchase defense.

Ottawa's Exhibits 2, 3, and 4 were lists of purchases from entities other than Hennings which Ottawa alleged were comparable and, therefore, provided evidence of the value of the goods sold by Hennings to Ottawa. Each witness who introduced the exhibits—Robert Craig, Norman Snyder, and Pat Donahue—testified, however, only about what the exhibits were intended to show and how the information had been compiled. None provided any analysis of why any particular purchase was a better indicator of fair market value than the purchase Hennings had made of the same product from its supplier. The lists were presented with little, if any, of the background information the Court had suggested in the In Limine Order would be necessary to give weight to any comparable purchase evidence.

Ottawa also presented Patrick McNally as its expert witness. Mr. McNally prepared a written report which was admitted without objection by the Trustee. After considering Mr. McNally's report and his testimony, his role and purpose in the case is unclear. Ottawa criticized the Trustee's calculations as to damages and filed a Motion to Strike the Trustee's report and expert testimony on the damage issue. In large part, Mr. McNally's report and testimony were used to support the Motion to Strike which will be discussed below and in a separate Order entered this date. To a more limited extent, Mr. McNally attempted to support Ottawa's comparable purchase defense.

During his testimony, Mr. McNally went through the various exhibits and pointed out what he thought were comparable purchases by product, date, and quantity. However, he failed to provide any support for the assertion that any particular purchase Craig, Snyder, or Ottawa made from another seller was better evidence of market value than the price Hennings paid its suppliers for the same goods.

Mr. McNally repeatedly asserted that what Hennings paid for the goods was irrelevant. The Court disagrees. If Hennings bought 1,000 gallons of a product for $10,000 and, on the same day, sold the same 1,000 gallons to Ottawa for $7,000, either sale could provide evidence of the fair market value of the goods. All of the evidence heard by this Court suggests that the first transaction—the purchase by

5. The exhibits which listed Craig, Snyder, and Ottawa's proposed comparable purchase information were Defendant's Exhibits 2, 3, and 4, respectively. The Trustee objected to the admission of these exhibits because, although they were labeled as lists of "Comparable Purchases", they did not contain references to any specific Hennings transactions which were alleged to be comparable. The Court reserved ruling on the admissibility of these exhibits. Now, having considered all of the evidence and the post-trial arguments of the parties, the Court will enter a separate Order admitting all three exhibits. The exhibits were foundational and, in combination with Defendant's Exhibits 5A and 5B, were helpful in understanding the magnitude of the transactions between Hennings and Ottawa and, unfortunately for Ottawa, the limited number of transactions which were even alleged to be comparable.

Hennings from its supplier—was at fair market value because it was at arm's length, in the open market, and from a published price list. The evidence also suggests, however, that the second transaction—the sale from Hennings to Ottawa—was not at fair market value because Hennings had a belief, albeit mistaken, that there would be more revenue received from each sale than what Ottawa paid. Ottawa, through its exhibits and Mr. McNally's testimony, seeks to present for some Hennings–to–Ottawa sales, yet a third transaction involving Craig, Snyder, or Ottawa as a buyer and another entity as the seller and wants the Court to find that this third transaction provides the true measure of value. The evidence presented was, however, limited to only establishing that such transactions occurred rather than establishing why the price paid in such transactions is the best evidence of the fair market value of the goods involved.

Mr. McNally also presented in his report a number of charts and graphs which purported to analyze comparable purchase data. Unfortunately, Mr. McNally used purchases in his analysis which did not conform to the In Limine Order regarding the foundation which must be presented for purchases to be relevant. Mr. McNally's report may have been prepared before the entry of the In Limine Order, but his failure to supplement and the failure of Ottawa's counsel to disclose the use of inadmissible sales in the analysis, causes the Court to find very little of value in Mr. McNally's report and testimony.

Mr. McNally testified that, in analyzing Ottawa's data, he excluded purchases from manufacturers and distributors but included purchases from brokers. For the reasons set forth in Judge Cudmore's Order and in this Court's Order In Limine, purchases from brokers are outside of the normal chain of distribution and would not be comparable to purchases from Hennings. In his report and criticism of Mr. Stone, Mr. McNally repeatedly stated that Mr. Stone failed to consider what was going on in the marketplace in determining the value of the chemicals sold to Ottawa. Mr. McNally, however, failed to review the data in a way that analyzed the marketplace in the way this Court had ordered and in a way that his own client had agreed to in pre-trial motions.

One example of the problems with Mr. McNally's graphs and charts relates to his "Attachment D—Comparison of Price Paid to Hennings to Price Paid to Other Suppliers." According to Mr. McNally, the chart's purpose was to show that Ottawa had paid less to others than it paid to Hennings for the products listed on Attachment D. On cross-examination, however, Mr. McNally had to admit that, with respect to one product, the lowest price he used in his comparison was for three gallons of the product purchased by Ottawa in September, 1998, when Hennings, in fact, had sold hundreds of gallons of the product to Ottawa during the prior spring's growing season. The fact that Ottawa bought three gallons of a product from a third party for $58.50 per gallon in September, 1998, is meaningless in determining whether the $90.50 per gallon that Ottawa paid Hennings in February, March, and April, 1998, for hundreds of gallons of the product was reasonably equivalent value.

Thus, Mr. McNally's tables and graphs were not useful in illustrating whether comparable purchases were made by Ottawa, Snyder, and Craig. He and Ottawa's counsel tried to rehabilitate their position after cross-examination by suggesting that Mr. McNally's graphs and charts were simply "one way to look at" the issues. But, that is not accurate because the way Mr. McNally "looked at" the purchase data

included the use of inadmissible evidence, thereby making the calculations worthless.

At the conclusion of the trial, the Court expressed frustration at the number of witnesses who had testified over a considerable length of time without the issue of comparable purchases ever being fully developed. Counsel for Ottawa assured the Court that the evidence could be tied together in written closing arguments, which the Court allowed. The Defendant's post-trial brief did not, however, contain the still-elusive analysis of why the sales listed on Defendant's Exhibits 2, 3, and 4 established the value for the goods involved. Rather, Ottawa's brief rehashed the Motion in Limine arguments, seeking to have the Court expand the definition of sellers for comparable purchases to include brokers.

This argument misses the mark. If Hennings were truly a broker, then Hennings should have been making its profit, if any, on each sale as it was made. Brokers sell outside the normal supply chain with no expectation of rebates or other incentives. They make what they make on each deal. Brokers do not buy at high prices and sell at low prices. This argument contradicts Ottawa's claims that Hennings and, hence, the Trustee, should have collected rebates on these sales. For Hennings to be a true broker, Hennings would have had to purchase, not just sell in the broker market.

After the conclusion of the briefing schedule, Ottawa sought leave to file an additional memorandum and additional findings of fact and conclusions of law, which the Court allowed. With that last filing, Ottawa attached a new list of a few sales it considered comparable. Again, however, Ottawa failed to provide any analysis of why these sales set the value of the goods.

Proof of comparable purchases sufficient to establish value is not made by a show-ing that one or several purchases occurred at a price lower than what Ottawa paid Hennings. As this Court pointed out in the In Limine Order, isolated sales have little weight. A few purchases do not necessarily establish a value for the goods which supercedes the published price list. James Caruso's purchase of a product in Texas on a "2 for 1" basis might have lead him to sell that product at a big discount and still make a profit. However, both the price he bought for and the price he sold for were one-time-only deals, not prices that would reflect the true market value of the goods. This is exactly what Judge Cudmore was talking about in his Order when he required foundational evidence of the price the seller paid.

Ottawa apparently believes that, if it can show one purchase at a price in the range which Ottawa paid Hennings, that one sale establishes the value of the goods and trumps the value established by the Trustee's evidence. Ottawa cites no authority for that position. In order to establish that the one sale is better evidence of value, however, the underlying circumstances of the sale would have to be disclosed so that this Court could compare the transactions and determine which purchase most clearly reflects the fair market value of the goods. Ottawa argued from its pre-trial motions through its final post-trial brief that the Court should consider the market and the volume of other transactions which occurred and use that evidence to determine the value of the goods transferred. Ottawa has not, however, established any other market or provided sufficient evidence of other transactions to establish a value different than the fair market value paid by Hennings to its suppliers. Isolated sales do not define the marketplace in a way that trumps the established marketplace identified by the Trustee for these goods.

The Trustee presented a strong *prima facie* case of the value of the goods sold to Ottawa by Hennings. Hennings bought in the open market from recognized sources based on published prices. Ottawa presented insufficient contradictory proof of the value of the goods. Despite its own expert's admonitions to look at the marketplace, no real evidence of any other marketplace was presented. Ottawa failed to present relevant evidence to overcome the Trustee's evidence.

Having determined the value of the goods sold to Ottawa by Hennings to be the price Hennings paid for them, the final step in the analysis is to determine whether what Ottawa paid for the goods was reasonably equivalent value. As set forth above, there is no precise statutory definition of reasonably equivalent value and there is no recognized formula for calculating it. Rather, all facts must be considered with weight given to the fair market value of the goods.

The evidence established that Hennings sold the goods to Ottawa at prices deeply discounted from what Hennings had paid its suppliers for the goods. Although the testimony often suggested discounts of 30%, the Trustee's spread sheets show actual discounts from 10% to 50% with most running in the 25% to 40% range. As will be discussed in more detail below, the Trustee's damage calculations remove from consideration sales in which the discount from Hennings to Ottawa was less than 18%. Thus, damages are only sought for sales where the discount from the fair market value—the price Hennings paid—was 18% or greater. The Court finds that these substantially-discounted prices do not represent the reasonably equivalent value of the goods sold.

The Court finds that the Trustee has proven by a preponderance of the evidence that Ottawa did not pay reasonably equivalent value for the products it purchased.

To the extent Ottawa had the burden of proof on this issue as an affirmative defense to the actual fraud cause of action, Ottawa failed to meet its burden.

*Constructive Fraud—Fraud in Law—740 ILCS § 160/5(a)(2)*

Fraud in law, or constructive fraud, is established if a debtor transfers property for less than reasonably equivalent value and is thereby unable to meet its obligations. *In re Zeigler, supra,* 320 B.R. at 374. This Court has already found that the transfers by Hennings to Ottawa were made without receiving reasonably equivalent value in exchange. Accordingly, the Court need only focus on the other required proof to establish this cause of action.

Because Hennings' transfers to Ottawa were made without receiving reasonably equivalent value in exchange, those transfers may be deemed constructively fraudulent under several circumstances. First, they are constructively fraudulent if Hennings was engaged or about to engage in business transactions for which Hennings' remaining assets were unreasonably small in relation to the anticipated transactions. 740 ILCS § 160/5(a)(2)(A). Second, the transfers are constructively fraudulent if Hennings intended to incur or believed or reasonably should have believed that debts were being incurred beyond Hennings' ability to pay. 740 ILCS § 160/5(a)(2)(B). The Trustee has the burden to prove one or more of these circumstances by a preponderance of the evidence.

Various financial documents were entered into evidence during the trial. As described above, Larry Hennings created false invoices for the Ottawa transactions which resulted in a phony receivable from Ottawa being shown on Hennings' financial statements. The first of the false invoices

entered into evidence was dated February 20, 1997, and showed a total balance due from Ottawa of $1,188,454.90. Everyone agrees that Ottawa did not owe that money.

Financial statements for February, 1997, and each month thereafter were also entered into evidence. In considering the statements through 1997, it is apparent that the receivables line item in the asset category is overstated, but it is not absolutely clear that the remaining assets were unreasonably small or that the liabilities shown on the statements could not be paid in the event of a liquidation. The Court doubts that the debts could have been paid, but the evidence at this point in time was not thoroughly developed.

The second false Ottawa invoice entered into evidence was dated May 19, 1998. The phony receivable alleged to be due from Ottawa on this document was $3,088,460.91. The financial statement from May, 1998, has the total of all receivables listed at $3,733,273. Thus, more than 80% of the receivable amount shown on the financial statement at that point was false. Further, on this financial statement, a new line item was added for "chemical companies receivables." Brent Lively, Hennings' accountant, testified that this new line was added to reflect the rebates Hennings claimed would come in and was added at this particular time because Hennings was beginning a factoring arrangement with the Bank. As discussed above, it was not reasonable for Hennings to believe that these receivables would be paid. Hennings had claimed rebates in 1997 and, in fact, received some large checks. The financial statements from 1997 through 1998 establish, however, that the overall amount received was not sufficient to justify the continuing practice of selling at deep discounts.

Certainly as of May, 1998, Hennings was aware of the negative results of its business activities and knew that it would be incurring debt that it could not pay if it continued to buy on credit from its suppliers and sell at deep discounts. Ottawa suggests that Hennings could have paid its bills if it had drawn down on the line of credit from the Bank, but that would not have changed whether excess debt was being incurred; it would have only changed the creditor to whom the debt was owed.

Hennings' May, 1998, financial statement contains material misstatements as to its assets which were made to induce the Bank to continue to lend money. These misstatements are so flagrant that they clearly establish knowledge on the part of Hennings that its remaining assets were unreasonably small in relationship to its anticipated transactions and that the debts it was incurring were beyond its ability to pay as they became due. It is clear to this Court that, after May, 1998, Hennings' assets—its legitimate assets—were unreasonably small to pay the debts it was incurring to continue to buy product to sell to Ottawa at deep discount. Likewise, by that same time, Hennings knew or should have known that the debts it was incurring to its suppliers for each discounted Ottawa sale were beyond its ability to pay.

The Trustee has met his burden of proof on all issues of constructive fraud under § 5(a)(2).

### Constructive Fraud—Fraud In Law— 740 ILCS § 160/6(a)

Constructive fraud, or fraud in law under § 6(a) of the Act, requires proof that Hennings had creditors before the transfers and failed to obtain reasonably equivalent value for the transfers. Additionally, the Trustee must prove that Hennings was either insolvent when the transfers were made or became insolvent as a result of the transfers. *In re Jumer's Castle*

*Lodge, Inc.*, 329 B.R. 837, 842 (Bankr. C.D.Ill.2005), *aff'd*, 338 B.R. 344 (C.D.Ill. 2006), *aff'd*, 472 F.3d 943 (7th Cir.2007); *Bowman v. Dixon Theatre Renovation, Inc.*, 221 Ill.App.3d 35, 41, 163 Ill.Dec. 650, 653–54, 581 N.E.2d 804, 807–08 (Ill.App. 1991).

■■■ The first two elements have been established. Hennings bought the goods sold to Ottawa on credit and, therefore, had creditors at all relevant points in time. Further, this Court has found that Hennings did not receive reasonably equivalent value for the transfers. Thus, the only remaining issue is whether Hennings was insolvent or became insolvent as a result of the transfers.

Insolvency is defined at § 3 of the Act, which provides in part as follows:

**160/3. Insolvency—assets—debts**

§ 3.(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.

(b) A debtor who is generally not paying his debts as they become due is presumed to be insolvent.

740 ILCS § 160/3(a) & (b).

■■■ The Trustee presented limited evidence on the insolvency issue. Brent Lively testified that, based on what he knew at the time of trial, he would estimate that Hennings was insolvent by late 1997 or early 1998. Mr. Lively's testimony apparently related to the false receivables which had been accruing. Mr. Lively did not, however, complete the type of thorough analysis needed to establish that, at a particular time, Hennings became insolvent. That analysis would require a review of the value of all of Hennings assets including the fixed assets and real estate of the company. *In re KZK Livestock, Inc.*, 290 B.R. 622, 624 (Bankr.C.D.Ill. 2002). The Court did not hear testimony on these issues. It is clear that, by the summer of 1999 when Hennings filed its Chapter 11 proceeding, it was insolvent. Sales to Ottawa had stopped, however, before that time. Although the Court found that, as of May, 1998, the false documents were sufficient to determine that Hennings reasonably should have known it was incurring debt beyond its ability to pay when due, the Court cannot use the same documents to pinpoint insolvency. Insolvency is a different concept with strict standards for proof which were not met by Mr. Lively's testimony.

Some evidence was also presented regarding the fact that Larry Hennings often wrote company checks which he held on to and did not send to vendors for some period of time. Larry Hennings admitted this and Brent Lively testified that he became aware of the practice during his staff's efforts to balance Hennings' bank statements. Although this evidence tends to suggest that Hennings was not paying its debts as they became due, it is insufficient to establish that fact by a preponderance of the evidence. No evidence was presented regarding to which creditors the checks were written, how long the checks were held, or whether the checks were in payment of debts which had, in fact, become due.

The Trustee failed to meet his burden under § 6(a) of the Act to prove that Hennings was insolvent or became insolvent as a result of the transfers to Ottawa.

*Damages*

To determine the relief to be accorded to the Trustee, further reference must be made to the Act. Section 8(a)(1) provides:

**160/8. Action for relief—Creditor**

§ 8.(a) In an action for relief against a transfer or obligation under this Act, a creditor, subject to the limitations in Section 9, may obtain:

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim[.]

740 ILCS § 160/8 (a)(1).

Section 9(b) and (c) provide in part as follows:

**160/9. Voidable transfers or obligations; rights of good-faith transferee**

§ 9.(b) Except as otherwise provided in this Section, to the extent a transfer is voidable in an action by a creditor under paragraph (1) of subsection (a) of Section 8, the creditor may recover judgment for the value of the asset transferred, as adjusted under subsection (c), or the amount necessary to satisfy the creditor's claim, whichever is less. . . .

(c) If the judgment under subsection (b) is based upon the value of the asset transferred, the judgment must be for an amount equal to the value of the asset at the time of the transfer, subject to adjustment as the equities may require.

740 ILCS § 160/9(b) and (c).

█ Together, these provisions establish that, once transfers have been deemed fraudulent, and thus avoidable, the Trustee is entitled to recover the property transferred or obtain a money judgment for the value of the assets transferred, less certain adjustments for the amounts paid by the transferee. Because of the nature of the assets transferred and the length of time that has passed since the transfers, the Trustee here seeks a money judgment.

█ To calculate the amounts he claims due, the Trustee created spread sheets showing each transaction between Hennings and Ottawa. The Trustee calcu-

lated the per-unit cost to Hennings to acquire each product sold and the per-unit price paid for the goods by Ottawa. The Trustee obtained the necessary information for his calculations by searching Hennings' records for supplier invoices and price lists and through discovery. The Trustee then calculated the percentage of discount Hennings gave Ottawa for each sale. Although the testimony generally was that Hennings sold to Ottawa for about a 30% discount, the actual discounts for sales from June, 1998, through January, 1999, ranged from 10.27% on the low end to 50.70% on the high end. The majority of sales involved discounts from 25% to 40%.

Because the Trustee and a secured creditor actually collected some rebates after the bankruptcy filing and, in what the Trustee characterized as an effort to calculate a "fair loss", the Trustee included in his calculations certain credits to Ottawa for rebate percentages from both manufacturers and distributors for each sale. The Trustee testified that he initially calculated proposed rebate concessions based on what was actually collected but, in his final figures, used the highest rebate amounts he could find in Hennings' records for both manufacturers and distributors. The Court finds no fault with the Trustee's concession of these discounts in his calculations. The Court also finds, however, that Ottawa was not entitled to these concessions and, therefore, its criticisms of the Trustee and his witness, Donald Wilkey, regarding how the concessions were calculated are not well founded.[6]

Also, with respect to a number of sales, the Trustee included an additional percentage discount for "early pay." Ottawa ar-

---

**6.** Ottawa's criticisms were contained in a Motion In Limine to Bar Opinion Testimony From Plaintiff's Named Experts filed before trial and taken under advisement and in the expert opinion report from Patrick McNally. A separate Order will be entered this date denying Ottawa's Motion.

gued that Hennings' suppliers offered early pay discounts, of which Hennings could have, but did not, take advantage. Ottawa asserts that, because it paid in full at the time of each purchase, Hennings could have taken advantage of the available discounts by immediately paying for the goods. Ottawa argues that such payments would have reduced Hennings' cost and, therefore, the "value" of the goods for purposes of this litigation.

The Trustee apparently felt there was at least some equity in Ottawa's arguments and included the early pay discount for sales where he determined it might have applied. In calculating the early pay discount, the Trustee gave Ottawa credit not only for what could have been saved by immediate use of Ottawa's payments, but also gave credit for the amounts that Hennings could have saved if the suppliers had been paid in full. For example, if Hennings bought goods for $7,500 from a supplier with a 3% early pay discount, the Trustee gave a $225 credit in his calculation even if Ottawa only paid $5,000 for the goods. Because application of Ottawa's $5,000 payment to the supplier's bill would have resulted in only a $150 discount, the Trustee has generously overstated this discount for Ottawa. The Court finds no fault with this calculation and believes that it supports this Court's overall impression that the Trustee made every effort to fairly calculate what is due from Ottawa.

In calculating the amount of loss from each transaction, the Trustee has taken the total Hennings was billed by a supplier for the goods and has then subtracted, in the appropriate cases, the early pay discount to arrive at a net cost to Hennings. From that number, the Trustee has subtracted the actual amounts paid by Ottawa and then given credit for the Trustee's calculation of rebate credits for each sale. The end result is a number for each transaction that the Trustee labeled "Hennings Net (Loss)Profit Before Overhead." Because of the rebate and early pay credits allowed by the Trustee, sales from Hennings to Ottawa in which the discount in price was less than 18% have been removed from the damage calculation. In each such case, the total of credits allowed by the Trustee exceeded the sales price discount, thereby resulting in no claimed loss by the Trustee.

This Court has added the amount of each loss transaction in the "Hennings Net (Loss)Profit Before Overhead" column for all sales from June, 1998, through January, 1999. That sum is $522,579.61. That amount represents the loss to the estate due to the failure of Ottawa to pay reasonably equivalent value for the goods purchased, and judgment will be entered accordingly.

The Trustee's calculations and requested damages also included amounts for Hennings' overhead. The Court rejects that request as not squaring with this Court's determination of the value of the goods. If the price paid by Hennings to its suppliers represents the fair market value of the goods, then that is the value that must be used as the starting point in the calculation. Ottawa could have gone to the same suppliers and bought the goods at the same list prices. It cannot be charged more than the market price for the goods in the calculation of damages for its failure to pay reasonably equivalent value.

Trustee also prays for pre-judgment interest against Ottawa. The decision to award pre-judgment interest lies within the sound discretion of the Bankruptcy Court. *In re Cybermech, Inc.,* 13 F.3d 818, 822 (4th Cir.1994). Pre-judgment interest should be awarded unless there is a sound reason not to do so. *Matter of Milwaukee Cheese Wisconsin, Inc.,* 112 F.3d 845, 849 (7th Cir.1997).

Compensation deferred is compensation reduced by the time value of money; that is why pre-judgment interest is an "ingredient of full compensation." *Id.*

■ Pre-judgment interest from the date of the filing of an adversary proceeding is recoverable pursuant to 28 U.S.C. § 1961. *In re H. King & Associates, supra*, 295 B.R. at 257. Section 1961 provides that, "[i]nterest shall be calculated ... at a rate equal to the weekly average 1–year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [ ] the date of the judgment." 28 U.S.C. § 1961(a); *In re Glatstian*, 215 B.R. 495, 498 (Bankr.D.N.J. 1997).

Trustee also prays for costs of suit. Costs "shall be allowed as of course to the prevailing party unless the court otherwise directs[.]" Fed.R.Bankr.P. 7054(d). Thus, Trustee's requests for costs are allowed. Trustee shall be given 14 days from the date of this Opinion to file a bill of costs; Ottawa shall be given 7 days from the date of the filing of the bill of costs to respond or object. The Court will then make a ruling or request further evidence or argument if either is warranted.

This Opinion is to serve as Findings of Fact and Conclusions of Law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.

See written Order.

**IT IS SO ORDERED.**

### ORDER

For the reasons set forth in an Opinion entered this day,

IT IS HEREBY ORDERED that Defendant's Exhibits 2, 3, and 4 are admitted into evidence over the objection of the Plaintiff.

**IT IS SO ORDERED.**

### ORDER

For the reasons set forth in an Opinion entered this day,

IT IS HEREBY ORDERED that judgment should be entered in favor of Plaintiff, Roger W. Stone, Trustee, and against Defendant, Ottawa Plant Food, Inc., in the aggregate amount of:

1. Damages of $522,579.61, plus

2. Pre-judgment interest pursuant to 28 U.S.C. § 1961 from the date of the filing of the Complaint—May 21, 2001—to the date of entry of a final Order, at the rate of the weekly average 1–year constant maturity Treasury yield for the calendar week preceding the entry of the final Order, plus

3. Costs of suit, pursuant to Fed. R.Bankr.P. 7054(d). Plaintiff is hereby ordered to file a bill of costs within 14 days of the date of this Order. Defendant is hereby ordered to file any response or objection to Plaintiff's bill of costs within seven days of the date of filing of Trustee's bill of costs.

A final judgment Order will be entered by this Court after ruling on the Plaintiff's bill of costs.